770 So.2d 1196 (2000)
CITY OF HOLLYWOOD, et al., Petitioners,
v.
Albert LOMBARDI, Respondent.
No. SC96482.
Supreme Court of Florida.
October 19, 2000.
*1197 Scott J. Brook of Peters, Robertson, Demahy, Parsons, Mowers, Passaro & Drake, P.A., Fort Lauderdale, Florida, for Petitioners.
Richard A. Sicking, Coral Gables, Florida, for Respondent.
PARIENTE, J.
We have for review a decision of the First District Court of Appeal that passed *1198 upon two questions certified by it to be of great public importance. See City of Hollywood v. Lombardi, 738 So.2d 491, 494-95, 496-97 (Fla. 1st DCA 1999). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.

FACTS
Albert Lombardi, the claimant in this workers' compensation case, began working as a building inspector for the City of Hollywood ("City") in 1986.[1]See Lombardi, 738 So.2d at 492. In September 1993, Lombardi slipped and fell while walking on a ramp in a home that he was inspecting. As a result of the fall, Lombardi suffered a shoulder injury. He was determined to be permanently and totally disabled as of December 19, 1994.
Lombardi's average weekly wage ("AWW") was $738.65, yielding a weekly compensation rate of $425. In January 1995, he began receiving benefits from the City's disability retirement pension plan in the amount of $2,623.37 per month. Lombardi had contributed $113 from his salary on a bimonthly basis to the pension plan. On May 12 and 15, 1995, Lombardi also received checks from his employer, the City, and its servicing agent Interrisk Concepts (hereinafter referred to collectively as "E/SA"), as payment for permanent, total disability ("PTD") benefits and supplemental benefits relating back to December 19, 1994.[2]
In addition to obtaining indemnity and medical benefits from the E/SA, Lombardi also filed a negligence action in the circuit court, as authorized by section 440.39(1), Florida Statutes (1993),[3] against the homeowners of the property where he was injured. In accordance with the statute, the E/SA then became subrogated to Lombardi's rights against the homeowners, and the E/SA filed the appropriate notice of a lien on any proceeds from Lombardi's claim. See § 440.39(2)-(3), Fla. Stat. (1993). Lombardi and the homeowners reached an out-of-court settlement for $100,000, which was the limit of the homeowners' insurance policy. After deducting attorneys' fees and costs incurred in the action ($37,329), from the $100,000 settlement amount, Lombardi's net recovery from the homeowners was $62,671.
The E/SA then moved in circuit court for equitable distribution of the settlement funds, seeking payment of its lien. By the time of the hearing on the motion, the E/SA had paid Lombardi $41,228.76 in compensation benefits. After receiving evidence, the circuit court calculated that the total amount of Lombardi's damages was $250,000, which took into account a percentage reduction for comparative negligence. The court then determined that the $62,671 Lombardi received from the third-party action as his net recovery represented 25% of his total damages. As a result, the court decided that the E/SA was entitled to that same percentage of reimbursement on all past and future compensation and medical benefits. Accordingly, the court directed Lombardi to pay the E/SA $10,307.19, which was 25% of the *1199 $41,228.76 the E/SA already paid to him. The court also authorized the E/SA to reduce future indemnity and medical payments by 25% in further repayment of the lien.
In accordance with the circuit court's order, the E/SA reduced its weekly compensation payments by 25% and began making reduced payments of $318.75 (75% of $425.00). At this point, additional disputes arose that were related to the E/SA's payment of benefits. In particular, the E/SA notified Lombardi that it intended to assert an additional offset based on past benefits it paid Lombardi that exceeded 100% of Lombardi's AWW. The E/SA based its claim of entitlement to an additional offset upon section 440.20(15), Florida Statutes (1993), and this Court's decision in Escambia County Sheriffs Department v. Grice, 692 So.2d 896 (Fla. 1997). The other significant area of controversy that arose was whether the amount of the E/SA's lien should be capped at Lombardi's net recovery, or rather, whether the amount of the lien should be capped at 25% of Lombardi's net recovery due to the fact that Lombardi only received 25% of his total damages.
After a hearing, the judge of compensation claims ("JCC") entered an order making the following determinations that are pertinent to the issues we review: (1) it allowed the E/SA to continue its 25% lien reduction until $62,671 in benefits (the amount of Lombardi's net tort recovery) were fully recovered; (2) it allowed the E/SA an additional offset based on Grice to the extent that the combination of workers' compensation and Lombardi's disability pension benefits exceeded 100% of his AWW; and (3) it directed that the 25% lien reduction be applied before calculating the total benefits and determining the 100% cap for purposes of the Grice offset.
On appeal, the First District affirmed the JCC's holding that the lien recovery should be calculated first but certified the question to this Court. See Lombardi, 738 So.2d at 494-95. In addition, the First District reversed the JCC's decision to allow the E/SA to recover the entire amount of the $62,671 net recoverv, finding that the E/SA was only entitled to a maximum recovery of $15,667.75 (representing 25% of the net recovery)[4] and certified the question to this Court. See Id. at 495-97.
The First District also reversed the JCC's ruling that allowed the E/SA to further reduce its benefits by taking an additional offset based on Grice because "if workers' compensation benefits are reduced based on disability pension benefits claimant received, and to which claimant contributed, such reduction in compensation may be violative of section 440.21." Id. at 497.

THE PERCENTAGE OF A PERCENTAGE ISSUE
The certified question that we discuss first is an issue that arises whenever a claimant, like Lombardi, receives a settlement from a third-party tortfeasor that is less than the full value of his or her tort claim. As specifically framed by the First District, the certified question asks this Court:

WHEN THE EMPLOYER/CARRIER IS ENTITLED TO A SUBROGATION LIEN UNDER SECTION 440.39, FLORIDA STATUTES (1993), AND THE CLAIMANT'S NET RECOVERY IN A SETTLEMENT WITH THE THIRD-PARTY TORTFEASOR IS LESS THAN 100 PERCENT OF THE CLAIMANT'S TOTAL DAMAGES, SHOULD THE EMPLOYER/CARRIER'S LIEN BE LIMITED TO A PERCENTAGE *1200 OF THE PERCENTAGE OF THE NET RECOVERY?
Id. at 496-97.
This issue requires us to determine whether there is a cap on the E/SA's third-party lien based upon the percentage that Lombardi's net recovery is to the full value of the claim, or whether the E/SA's third-party lien is capped at the amount of Lombardi's net recovery. On appeal to the First District, Lombardi argued that because he had received only 25% of his total damages in the settlement of his tort claim, the E/SA's lien should be capped at $15,667.75, which represents 25% of his net recovery of $62,671. See Id. at 495. In other words, Lombardi asserted that the E/SA should receive only a "percentage of the percentage of total damages." Id. To the contrary, the E/SA maintains that it is entitled to receive reimbursement for the full amount of its lien limited only by the amount of Lombardi's net recovery.[5]
Both parties rely on the same language in section 440.39(3)(a), Florida Statutes (1999), which under its current version states as follows:
[I]f the employee ... can demonstrate to the court that he or she did not recover the full value of damages sustained, the employer or carrier shall recover from the judgment or settlement, after costs and attorney's fees incurred by the employee ... in that suit have been deducted, a percentage of what it has paid and future benefits to be paid equal to the percentage that the employee's net recovery is of the full value of the employee's damages ....
(Emphasis supplied.)
Because workers' compensation benefits are a creature of statute, see Travelers Ins. Co. v. Sitko, 496 So.2d 920, 921 (Fla. 1st DCA 1986), our answer to the certified question must be based on statutory interpretation guided by this Court's prior case law interpreting the applicable statutes. See J.J. Murphy & Son, Inc. v. Gibbs, 137 So.2d 553, 562 (Fla.1962) ("Work[er's] compensation is entirely a creature of statute and must be governed by what the statutes provide, not by what deciding authorities feel the law should be.").
Over the years, section 440.39(3)(a) has undergone a series of changes. See generally Reginald E. Wilcox, Determining and Satisfying Liens for Workers' Compensation Benefits, Fla. B.J. 39 (Apr.1990). The amendment that is significant for our purposes occurred in 1989. At that time, the Legislature added the language that the First District relied on in concluding that the E/SA's equitable distribution recovery should be capped at a percentage of the percentage of the total damages that Lombardi recovered. See Lombardi, 738 So.2d at 496. The following language was changed in 1989 (words stricken are deletions; words underlined are additions):
[I]f unless the employee or dependent can demonstrate to the court that he did not recover the full value of damages sustained the employer or carrier shall recover from the judgment or settlement, after costs and attorney's fees incurred by the employee or dependent in that suit have been deducted, a percentage of what it has paid and future benefits to be paid equal to the percentage that the employee's net recovery is of the full value of the employee's damages; provided, the failure by the employer or carrier to comply with the duty to cooperate imposed by subsection (7) may be taken into account by the trial court in determining the amount of *1201 the employer's or carrier's recovery, and such recovery may be reduced, as the court deems equitable and appropriate under the circumstances, including as a mitigating factor whether a claim or potential claim against a third party is likely to impose liability upon the party whose cooperation is sought, if it finds such a failure has occurred because of comparative negligence or because of limits of insurance coverage and collectibility.
Ch. 89-289, § 21, at 1771, Laws of Fla.
The legislative history of the statute is silent as to the purpose of the 1989 changes. See Fla. S. Comm. on Ins., CS for SB 896 (1989) Staff Analysis (May 19, 1989). The First District, however, determined that the "statutory language at issue was a codification of the formula set out in Nikula [v. Michigan Mutual Insurance, 531 So.2d 330 (Fla.1988)] and Manfredo [v. Employer's Casualty Insurance Co., 560 So.2d 1162 (Fla.1990)]." Lombardi, 738 So.2d at 496. At the same time, the First District recognized that both of these cases addressed earlier versions of section 440.39 and that "neither Nikula nor Manfredo address this precise issue." Id.
In Nikula, this Court addressed whether, under the 1981 version of the statute, the employer's lien reduction should be based upon the ratio of settlement amount to full value rather than based on the percentage of comparative negligence.[6] 531 So.2d at 330. The Court rejected the argument that the lien should be based on the percentage of the claimant's comparative negligence and instead held that the employer's lien "shall be based upon the ratio of settlement amount to full value of damages." Id. at 330-31. Thus, the Court determined that the employer's lien should have been for "24% of benefits" because the employee received 24% of his total damages. Id. at 331. In Manfredo, this Court interpreted both the 1981 and 1983 versions of the statute and again affirmed "that, using the ratio of net recovery to the judicially determined full value of the third-party claim, the carrier in this case is entitled to 32.7% of the amounts previously paid to Manfredo, and the carrier may deduct 32.7% from future payments to Manfredo." 560 So.2d at 1165.
By deleting the phrase "because of comparative negligence," in 1989, the Legislature eliminated the portion of the statute that had caused confusion before Nikula regarding the calculation of the equitable distribution percentage. Thus, by adding the phrase the "employer or carrier shall recover ... a percentage of what it has paid ... equal to the percentage that the employee's net recovery," the 1989 amendment appears to be a codification of our holding in Nikula that a percentage reduction is determined by the percentage of the net recovery to the full value of the damages, rather than the percentage of comparative negligence.[7]
Ironically, it was the addition of that language in 1989 that has led to the dispute *1202 in this case as to whether there is also a "percentage of a percentage" cap on the E/SA's recovery. Although the E/SA asserts there is language in Nikula and Manfredo that supports its position, neither Nikula nor Manfredo addressed the issue presented by the certified question.
Rather, this Court addressed this issue long ago in Aetna Insurance Co. v. Norman, 468 So.2d 226, 228 (Fla.1985). In Norman, we held that the employer's lien on recovery was capped at the claimant's net recovery and that the court "should have used the net tort recovery by the claimant as the amount which must be satisfied before the carrier need recommence full payment of future benefits." Id.; see Bussert v. Holley, 653 So.2d 1146, 1147 (Fla. 4th DCA 1995). Although this Court decided Norman under a prior version of section 440.39, neither the earlier statute nor the present statute specifically addresses the issue of the cap on the lienor's recovery. However, "the legislature is presumed to know the judicial constructions of a law when enacting a new version of that law." Brannon v. Tampa Tribune, 711 So.2d 97, 100 (Fla. 1st DCA 1998); see Schwartz v. Geico Gen. Ins. Co., 712 So.2d 773, 775 (Fla. 4th DCA 1998). "Furthermore, the legislature is presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed in the new version." Brannon, 711 So.2d at 100. Accordingly, we find nothing in the 1989 legislative changes to section 440.39 that would, either expressly or by implication, overturn this Court's holding in Norman, 468 So.2d at 228. Norman therefore represents a binding judicial construction of the equitable distribution statute that remains unchanged after the 1989 amendments.[8]
We recognize that the conclusion we reach here may, in certain cases, result in a claimant's net tort recovery being consumed by the repayment of the carrier's lien. Nonetheless, we find that if the Legislature intended to enact such a significant change in the law and so drastically limit the lien rights of carriers by shifting to the "percentage of a percentage" formula, the Legislature would have expressed this intent clearly in the statute.[9] To the contrary, we find that the addition of the phrase relied on by Lombardi was intended to codify Nikula and it left our holding in Norman intact. Accordingly, we quash the First District's decision on this issue and answer the certified question in the negative.

WHETHER WORKERS' COMPENSATION BENEFITS ARE PRIMARY
The next issue that we address, whether workers' compensation benefits should be primary when the collateral benefit *1203 is a pension plan that is employee-contributory, is yet another question left unresolved in the wake of our opinion in Grice, 692 So.2d at 898.[10] In Grice, the employee received workers' compensation benefits, state disability retirement benefits and social security disability benefits. Id. at 897. This Court interpreted section 440.20(15), Florida Statutes (1993),[11] to mean that "an injured worker, except where expressly given such a right by contract, may not receive benefits from his employer and other collateral sources which, when totaled, exceed 100% of [a claimant's] average weekly wage." Id. at 898. Lombardi refers to the reduction of the workers' compensation benefits because of the existence of other collateral benefits as a "Grice offset" and he contends that such an offset is inapplicable to this case because Lombardi contributed to the pension plan.
In contrast, Lombardi argues that the offset that is applicable to this case is a "Barragan offset" based on Barragan v. City of Miami, 545 So.2d 252, 254 (Fla. 1989), a case that he claims applies to situations where the employee has contributed to the collateral benefits. Indeed, in this case, unlike in Grice, Lombardi contributed to the pension plan that produced his disability retirement pension benefits.[12] This distinguishing factor requires us to consider the effect of section 440.21(1), Florida Statutes (1993):

No agreement by an employee to pay any portion of premium paid by his employer to a carrier or to contribute to a benefit fund or department maintained by such employer for the purpose of providing compensation or medical services and supplies as required by this chapter shall be valid, and any employer who makes a deduction for such purpose from the pay of any employee entitled to the benefits of this chapter shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.083.
(Emphasis supplied.)
This statute was implicated in Barragan, in which the claimant (Barragan), who *1204 was an employee of the City of Miami, suffered a permanent work-related injury and was granted both compensation benefits and disability pension benefits. 545 So.2d at 253. Although not specifically mentioned in the majority opinion, it is clear from Justice Ehrlich's special concurrence that Barragan contributed to the pension plan. See Id. at 255 (Ehrlich, J., concurring in result only). Barragan was contractually entitled to his pension benefits pursuant to a City ordinance, which was part of his pension and employment contract,[13] but the City reduced the amount of Barragan's disability benefits by the amount of his workers' compensation benefits. See Id. at 253. On review, this Court determined that "[u]nder state law, section 440.21 prohibits an employer from deducting workers' compensation benefits from an employee's pension benefits." Id. at 254. We observed that since 1973 "there was no state statute on this subject which authorized public employees to be treated any differently than private employees." Id. Accordingly, we held that the city's illegal reduction of workers' disability pension benefits as an offset of workers' compensation benefits permitted the Deputy Commissioner to increase compensation benefits to the worker up to a combined total that did not exceed his average monthly wage. See Barragan, 545 So.2d at 255.
The First District explained our decision in Barragan as resulting in the City being "required to pay the full amount of workers' compensation and could reduce pension benefits only to the extent the combination of all benefits exceeded the claimant's AWW." Lombardi, 738 So.2d at 497. In this case, Lombardi received both workers' compensation benefits and disability retirement pension plan benefits, and the combined total of the two were in excess of his average weekly wage. As explained above, the disability benefits came from a fund to which Lombardi contributed.
The First District recognized that to allow workers' compensation benefits to be reduced based on disability pension benefits to which an employee contributes might violate section 440.21, the same statute implicated in Barragan. See Lombardi, 738 So.2d at 497. Nonetheless, the First District stated that it was "not convinced that the Florida Supreme Court intended to create two different types of offsets, allowing employer/carriers to reduce different benefits based on the contributors to the particular funds." Id. at 497.
We respond to the First District's inquiry by explaining that our decision in Grice was directed only to whether additional collateral benefits should be included in computing the AWW 100% cap for total benefits. We have acknowledged that the 100% AWW cap that we discussed in Grice did not come from a strictly literal reading of section 440.20(15), but rather from a "judicial interpretation of an ambiguous statute."[14]Dixon, 767 So.2d at 445; see Acker, 755 So.2d at 601.
In Grice, we were not presented with the issue of whether the state retirement fund should receive the benefit of the offset rather than the workers' compensation fund.[15] Further, in Grice, we did not discuss *1205 the policies behind which fund should receive the benefit of the offset, although the First District has observed that in Grice, "the only funds within the employer's control that could be reduced were workers' compensation benefits, since the state of Florida paid the disability retirement and the federal government paid the social security disability." Lombardi, 738 So.2d at 497. Lastly, and most importantly, section 440.21 was not implicated in Grice, and therefore, in that case we could not have addressed the interplay between section 440.21(1) and section 440.20(15).
Section 440.21(1) prohibits an employee from contributing to his or her workers' compensation benefits.[16] Accordingly, we hold that where the "pension plan is funded at least in part with employees' contributions, decreasing workers' compensation benefits on account of pension benefits runs afoul of section 440.21, Florida Statutes (1993)." Lombardi, 738 So.2d at 498. (Benton, J., concurring in part and dissenting in part). Thus, once it is determined that the pension plan is funded with employees' contributions, workers' compensation benefits are primary and it is the pension fund that is entitled to the benefit of the offset.[17] As applied to this case, therefore, the result is that the workers' compensation benefits are primary. Our holding should not be read to mean that in all other cases the workers' compensation fund automatically receives the benefit of the offset; rather, we hold only that where the fund is employee-contributory, it would violate section 440.21 for workers' compensation benefits to be reduced.
Rather than merely reversing the JCC's ruling on this issue, the First District remanded with instructions to "determine whether claimant's disability pension has a provision comparable to that in Barragan" and if so to apply any offset arising from the AWW cap to Lombardi's disability retirement benefits. Id. at 498. The First District also directed that if no such provision exists, the JCC was to consider Lombardi's "pro rata contributions to the disability retirement plan in determining any offset to workers' compensation benefits." Id. Because the provision in Barragan was illegal, we are uncertain what effect a similar provision would have on the ultimate outcome in this case. However, because in this case we determine that workers' compensation benefits are primary when the employee has contributed to the pension plan, and because Lombardi agrees that any offset should be applied to his disability *1206 pension benefits, we find no reason to remand to determine whether a contractual provision exists.[18]

TIMING OF THE LIEN REDUCTION
The last issue that we address arises because of the existence of the third-party lien in light of our pronouncement in Grice. The question states as follows:

WHEN AN EMPLOYER/CARRIER IS ENTITLED TO REDUCE A CLAIMANT'S COMPENSATION BENEFITS AS A RESULT OF A SUBROGATION LIEN UNDER SECTION 440.39, FLORIDA STATUTES, SHOULD THE EMPLOYER/CARRIER APPLY THE LIEN REDUCTION BEFORE OR AFTER CALCULATING TOTAL BENEFITS AND APPLYING THE 100 PERCENT AVERAGE WEEKLY WAGE CAP AND RESULTANT OFFSET AUTHORIZED BY SECTION 440.20(15), FLORIDA STATUTES, AND Escambia County Sheriff's Dept. v. Grice, 692 So.2d 896 (Fla.1997)?
Lombardi, 738 So.2d at 494-95.
We agree with the First District that because the emphasis is on preventing the claimant from receiving total benefits from workers' compensation benefits and other collateral sources in excess of 100% of the claimant's AWW, it is reasonable to determine the lien reduction before the AWW and resultant offset. See id. at 494. In this case, because of our conclusion that workers' compensation benefits are primary, we do not perceive that there will be any ultimate effect on the workers' compensation payments. However, because the question was passed on by the First District, we exercise our discretion to decide the question.[19] Accordingly, we answer the First District's certified question by approving of its reasoning in Lombardi.
In conclusion, we quash the First District's decision as to the "percentage of the percentage" issue and we quash the First District's decision requiring a remand before determining whether the offset should be applied to benefit the pension fund or the workers' compensation fund. We approve, however, the First District's holding that the third-party lien reduction should be applied before calculating the total benefits and applying the 100% AWW cap. We decline to address the remaining issues[20] and remand for proceedings consistent with this opinion.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Albert Lombardi was born on February 9, 1926, and therefore is currently seventy-four years old.
[2] Lombardi "also receive[d] $97.50 in pension benefits from employment he held in New York and $1,179 in social security retirement benefits, but those amounts have not been considered in the calculations." Lombardi, 738 So.2d at 493 n. 1. The First District explained that social security retirement benefits are not subject to an offset. See id. at 497. These statements have not been questioned on appeal to this Court.
[3] Section 440.39(1), Florida Statutes (1993), provides that:

If an employee, subject to the provisions of the Workers' Compensation Law, is injured or killed in the course of his employment by the negligence or wrongful act of a third-party tortfeasor, such injured employee or, in the case of his death, his dependents may accept compensation benefits under the provisions of this law, and at the same time such injured employee or his dependents or personal representatives may pursue his remedy by action at law or otherwise against such third-party tortfeasor.
[4] Actually, 6.25% of $250,000 is $15,625. The variance between this figure and $15,667.75 is due to the fact that the net settlement was actually 25.068% of the damages. No one, however, disputes the use of 25%, and therefore, for ease of calculations, that figure is used here.
[5] The E/SA argues that Lombardi should have appealed the issue of the cap on the lien at the time the circuit court ruled. Because the circuit court's order did not address the issue of the cap or the ceiling on the total amount of the lien recovered, we agree with the First District that there was no "res judicata prohibition." Lombardi, 738 So.2d at 496 n. 2. We do not, however, address the subsidiary question of whether the issue of the cap should have been submitted to the circuit court, instead of the JCC, as Judge Benton contends. See id. at 499 (Benton, J., concurring in part and dissenting in part).
[6] The 1981 version of the statute provided in pertinent part:

The employer or carrier shall recover from the judgment, after attorney's fees and costs incurred by the employee or dependent in that suit have been deducted, 100 percent of what it has paid and future benefits to be paid, unless the employee or dependent can demonstrate to the court that he did not recover the full value of damages sustained because of comparative negligence or because of limits of insurance coverage and collectibility.
§ 440.39(3)(a), Fla. Stat. (1981).
[7] In addition to codifying our holding in Nikula, the 1989 amendment also clarified other aspects of equitable distribution by: (1) providing that the total amount of costs and attorney's fees is to be deducted from the gross recovery regardless of whether the employee recovers the full damages or not; (2) clarifying that the equitable distribution formula would apply whether the recovery was by judgment or settlement; (3) striking the language that limited the ability to prove that the claimant had received less than full value of damages (e.g., "because of comparative negligence or because of limits of insurance coverage and collectibility") to allow the claimant to "demonstrate to the court that he did not recover the full value of damages sustained," regardless of the reason; and (4) including a mechanical formula for determining equitable subrogation. See ch. 89-289, § 21, Laws of Fla.
[8] In further support of its interpretation that the lien should be capped at a "percentage of a percentage," the First District stated that "to conclude otherwise and adopt the E/SA's interpretation of the statute, the E/SA would be entitled to recover all that Lombardi received in the civil action, which would necessarily include damages for pain and suffering and loss of consortium." Lombardi, 738 So.2d at 496. However, we specifically addressed this issue in Norman and determined that the statute does not permit the trial court to offset or prorate the value of pain and suffering or derivative claims from the net recovery received from a third party tortfeasor. 468 So.2d at 228.
[9] Although the Legislature was silent as to its specific intent in adopting the language that we review, the Staff Analysis of the statute does contain a comment stating generally that the bill, which incorporated changes to many other statutes in addition to this one, "follows most of the recommendations of the Governor's Task Force on Workers' Compensation [which] was organized for the purpose of recommending changes in an attempt to reduce costs." Fla. S. Comm. on Ins. CS for SB 896 (1989) Staff Analysis 13 (May 19, 1989) (emphasis supplied). Therefore, because the legislative purpose was to reduce costs, it is unlikely that the Legislature would have included an amendment that would have allowed employers to receive less back on their third-party lien by including a total cap that was less than the net recovery.
[10] Since this Court's decision in Grice, both this Court and the First District have resolved or are considering several cases generated by our Grice decision. See, e.g., City of Clearwater v. Acker, 755 So.2d 597 (Fla.1999); State v. Herny, 24 Fla. L. Weekly D2467, ___ So.2d ___, 1999 WL 979474 (Fla. 1st DCA Oct.29, 1999), review granted, 761 So.2d 332 (Fla.2000); HRS Dist. II v. Pickard, 24 Fla. L. Weekly D1749, ___ So.2d ___, 1999 WL 503456 (Fla. 1st DCA 1999), review granted, 760 So.2d 946 (Fla.2000); Gab Business Services, Inc. v. Dixon, 739 So.2d 637 (Fla. 1st DCA 1999), quashed, Dixon, 767 So.2d 443 (Fla. Aug. 24, 2000); HRS v. Pascual, 25 Fla. L. Weekly D596, ___ So.2d ___, 2000 WL 242770 (Fla. 1st DCA Mar.06, 2000); Nolan v. Delta Airlines, 733 So.2d 1076 (Fla. 1st DCA 1999), review denied, 743 So.2d 508 (Fla. 1999); Dixon v. Pasadena Yacht & Country Club, 731 So.2d 141 (Fla. 1st DCA 1999), review dismissed, 753 So.2d 565 (Fla.2000). Additionally, Lombardi has raised the spectre of many unintended consequences and unanswered questions that have arisen as a result of Grice. However, it is beyond the scope of this opinion to deal with these issues.
[11] Section 440.20(15), Florida Statutes (1993), provides:

When an employee is injured and the employer pays his full wages or any part thereof during the period of disability, or pays medical expenses for such employee, and the case is contested by the carrier or the carrier and employer and thereafter the carrier, either voluntarily or pursuant to an award, makes a payment of compensation or medical benefits, the employer shall be entitled to reimbursement to the extent of the compensation paid or awarded, plus medical benefits, if any, out of the first proceeds paid by the carrier in compliance with such voluntary payment or award, provided the employer furnishes satisfactory proof to the judge of compensation claims of such payment of compensation and medical benefits. Any payment by the employer over and above compensation paid or awarded and medical benefits, pursuant to subsection (14), shall be considered a gratuity.
[12] In Grice, the state retirement plan was employee noncontributory, and therefore, section 440.21, Florida Statutes (1993), did not apply.
[13] Although the fact that the claimants, police officers with the City of Miami, were contractually entitled to the benefits and contractually agreed to the offset is also not entirely clear from the majority opinion, this fact becomes clear from a reading of the certified question and the lower courts' opinions. See Barragan, 545 So.2d at 253; see City of Miami v. Knight, 596 So.2d 104, 104-05 (Fla. 1st DCA 1992).
[14] Although section 440.15(9) specifically allows a reduction of workers' compensation by the amount of social security disability paid, no similar statute within the workers' compensation statutory scheme refers to how disability retirement benefits should be treated.
[15] Lombardi points us to the amicus curiae brief filed by the State of Florida, Division of Retirement ("FRS") in HRS District II v. Pickard, 24 Fla. L. Weekly D1749, ___ So.2d ___, 1999 WL 503456 (Fla. 1st DCA July 19, 1999), review granted, 760 So.2d 946 (Fla.2000). In that case, the FRS argues that "the use of benefits paid under the FRS to offset workers' compensation benefits abridges and reduces the right of FRS members to receive the full benefit of payments made to them.... FRS members are contractually entitled to FRS benefits independent of receipt of workers' compensation benefits. Their benefits should not, therefore, be used to effect an offset." Because this case does not involve state disability retirement benefits, and because we reach our conclusion based on our interpretation of section 440.21, we do not reach the issue here.
[16] Lombardi contends that section 440.21 is similar to 29 U.S.C. §§ 1001, 1103(c)(1) (part of the Employee Retirement Security Act of 1974), which prohibits private employers from making payments from employee trust funds to satisfy their own obligations to pay workers' compensation benefits. He argues that public and private employees should not be treated differently in this regard and thus this construction of section 440.21 is consistent with federal law that is applicable to private employees.
[17] Our decisions in a series of cases also have been interpreted to stand for the proposition that workers' compensation benefits cannot be reduced by any benefit to which the claimant is contractually entitled independent of workers' compensation. See Barragan, 545 So.2d at 254 (citing Jewel Tea Co. v. Florida Indus. Comm'n, 235 So.2d 289 (Fla.1969) (group insurance benefits)); Brown v. S.S. Kresge Co., 305 So.2d 191 (Fla.1974) (sick leave benefits); Domutz v. Southern Bell Tel. & Tel. Co., 339 So.2d 636 (Fla.1976) (pension benefits). Although in Jewel Tea the employee contributed to the benefits, in Barragan we cited Domutz for the proposition that section 440.21 was applicable regardless of whether the employee contributed to the funding of these benefits. See Barragan, 545 So.2d at 254.
[18] Further, the First District did not explain how determining pro rata contributions to the plan would affect the offset calculations, and because Lombardi is not claiming that the amount of his contributions should be excluded from the determination of the AWW, we make no determination as to whether these remand instructions are consistent with our decision in this case. Lombardi does not claim here that the percentage amount that he contributed should be excluded from the AWW calculations. Cf. HRS v. Pascual, 25 Fla. L. Weekly D596, ___ So.2d ___, 2000 WL 242770 (Fla. 1st DCA Mar.6, 2000).
[19] Even if our answer to the second question might make the answer to the certified question moot in this case, we nonetheless exercise our discretion to answer this certified question because it is one of great public importance and is likely to recur. See Dugger v. Grant, 610 So.2d 428, 429 n. 1 (Fla.1992); Holly v. Auld, 450 So.2d 217, 218 n. 1 (Fla. 1984).
[20] These issues are whether the First District erred by (1) failing to allow the E/SA credit for overpayments made pursuant to the Grice offset for periods after December 19, 1994; and (2) affirming the award of penalties and interest on the May 1995 payments.