986 So.2d 1260 (2008)
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, Petitioner,
v.
CONTRACTPOINT FLORIDA PARKS, LLC, et al., Respondents.
No. SC07-1131.
Supreme Court of Florida.
July 10, 2008.
*1261 Bill McCollum, Attorney General, Scott D. Makar, Solicitor General, and Louis F. Hubener, Chief Deputy Solicitor General, Tallahassee, FL, for Petitioner.
Mike Piscitelli, Bradley S. Copenhaver, and Eduardo S. Lombard of Vezina, Lawrence and Piscitelli, P.A., Fort Lauderdale, Florida, and W. Robert Vezina, III of Vezina, Lawrence and Piscitelli, P.A., Tallahassee, FL, for Respondents.
PARIENTE, J.
The issue in this case is whether the State is required to pay a lawful judgment arising from a breach of contract action. In order to decide this issue we must interpret section 11.066(3), Florida Statutes (2005), on which the Department of Environmental Protection relied in refusing to pay the judgment against it. In ContractPoint Florida Parks, LLC v. State, 958 So.2d 1035 (Fla. 1st DCA 2007), the First District Court of Appeal held that section 11.066 does not prevent the State or a state agency from paying a judgment in the absence of a specific appropriation but certified the following question to be one of great public importance:
DOES SECTION 11.066, FLORIDA STATUTES, APPLY WHERE JUDGMENTS HAVE BEEN ENTERED AGAINST THE STATE OR ONE OF *1262 ITS AGENCIES IN A CONTRACT ACTION?
Id. at 1038. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
For the reasons that follow, we conclude that section 11.066 was not intended to require a specific legislative appropriation before a governmental entity can be required to pay a valid judgment entered into for breach of contract with a private entity. We reach this decision not based on our own view of the "best" policy for the State, but by applying well-established principles of statutory construction. Accordingly, we answer the certified question in the negative and approve the decision of the First District.

FACTS AND PROCEDURAL HISTORY
This case involves a contract entered into between the State and a private entity at a time when the State sought to "privatize" many of its operations. In April 2001, the Florida Department of Environmental Protection (DEP) entered into a concessions agreement with ContractPoint Florida Parks, LLC (ContractPoint) whereby ContractPoint would finance, construct, and operate 143 vacation cabins and associated concessions in eight state parks. Under the concessions contract, ContractPoint was obligated to pay DEP fifteen percent of its gross sales for thirty years, with two ten-year renewal options based on satisfactory performance.
ContractPoint brought a suit against DEP for wrongful termination of the contract. In August 2005, a jury found that DEP breached the contract and judgment was entered in favor of ContractPoint for $628,543. The basis for the breach of contract action against DEP, the amount of the judgment, and the validity of the judgment are not at issue in this case. The issue here concerns DEP's refusal to pay the judgment based on its assertion that section 11.066 prohibits a state agency from paying any judgment unless there is a specific appropriation by the Legislature for that judgment. In December 2005, ContractPoint filed a Petition for Writ of Mandamus in the trial court seeking to compel DEP and Florida's Chief Financial Officer to pay the judgment. Based on its interpretation of 11.066, the trial court denied ContractPoint's petition, finding no clear duty on the part of DEP to pay the judgment without a specific appropriation for that purpose.
On appeal, the First District reversed, relying on this Court's decision in Pan-Am Tobacco Corp. v. Department of Corrections, 471 So.2d 4 (Fla.1984), which held that when the State enters into a legislatively authorized contract with a private entity, "sovereign immunity will not protect the state from action arising from the state's breach of that contract." Id. at 5. The First District noted in ContractPoint that since Pan-Am, the Legislature has actually promoted public/private contracting projects through several statutes and that the interpretation urged by the State would defeat that very purpose by rendering "all public/private contracts illusory." ContractPoint, 958 So.2d at 1038. Accordingly, the First District concluded that the Legislature did not intend section 11.066 to apply to actions in contract and, therefore, held that the statute did not prohibit payment of the breach of contract judgment by DEP. Id.

The Contract
The contract between DEP and ContractPoint, entitled "Concession Agreement," is seventeen pages in length and comprises forty-five separate paragraphs. It imposes many obligations on ContractPoint and includes at least two paragraphs (paragraphs 31 and 32) wherein it waives certain types of claims for compensation by ContractPoint. The contract includes *1263 the following express remedies to the State for certain breaches by ContractPoint: (1) if ContractPoint does not pay the monthly concession fees on time, liquidated damages will be assessed (paragraph 25); (2) if the payments and damages are not received timely, DEP may take possession and cancel the agreement (paragraph 25); (3) DEP has a continuing lien on all ContractPoint personal property and in the event of default may take possession and sell the personal property (paragraph 28); (4) DEP may terminate the agreement at any time for failure to perform (paragraph 40); and (5) if the agreement is terminated and ContractPoint holds over, such shall constitute trespass for which DEP is entitled to receive liquidated damages of $300 per day (paragraph 40).
Thus, under the contract, not only does DEP have the right to compensation for breach, it also has a right to a lien against ContractPoint's personal property. And, of paramount importance to the issue in this case, there is no limitation contained in either the contract or the statutes on DEP's right to sue the contractor and enforce any judgment it might obtain. It is also noteworthy that the contract could have, but did not, contain provisions for liquidated damages against the agency or mandatory alternative dispute resolution procedures, such as arbitration. The Concession Agreement states that it "shall be interpreted in such manner as to be effective and valid under applicable law" and concludes that it "represents the entire agreement of the parties." (Paragraph 17; emphasis supplied.)

Statutes Related to the Contract with DEP
The Legislature expressly granted DEP contracting authority in section 258.007(3), Florida Statutes (2000), which authorizes DEP through its Division of Recreation and Parks to "grant privileges, leases, concessions, and permits for the use of land for the accommodation of visitors in the various parks, monuments, and memorials."[1] This statute was in effect before enactment of section 11.066 and has remained in effect ever since. Section 258.007(3) is an explicit authorization by general law for DEP to enter into express, written concessions contracts with private parties and it was under this legislative authority that DEP contracted with ContractPoint in this case.
Moreover, the Legislature expressly encouraged and authorized DEP to contract with private entities for the specific type of project contemplated in the concessions contract between DEP and ContractPoint. Subsection (3)(a) of section 258.015, Florida Statutes (2000), enacted prior to the execution of the contract in this case, provides:
(3) PARTNERSHIPS IN PARKS. 
(a) The Legislature recognizes that many of the parks in the state park system need a variety of facilities to enhance their use and potential. Such facilities include, but are not limited to, improved access, camping areas, picnicking shelters, park management offices and facilities, and environmental education facilities. The need for such facilities has exceeded the ability of the state to provide such facilities in a timely manner with moneys available. The Legislature finds it to be in the public interest to provide incentives for partnerships with private organizations with the intent of producing additional revenue *1264 to help enhance the use and potential of the state park system.
The Legislature also appropriated $9.5 million to DEP in fiscal year 2000/2001, which DEP intended to use in its "cabins initiative," although under the Concession Agreement, the burden of financing and construction of cabins in eight state parks was placed on ContractPoint.
DEP's contract with ContractPoint appears to fall squarely within the purview of the Partnerships in Parks program. Under the terms of the contract, DEP would increase the use and potential of the state park system, while receiving fifteen percent of gross sales for the new facilities and without increasing the burden on the State to provide the facilities  a goal specifically encouraged by section 258.015. Under the contract, ContractPoint would receive profit incentives to build and operate the cabins and concessions. In fact, it was primarily ContractPoint's expenditures made toward performing under this contract that formed the basis of the final judgment in this case. We must now answer the question posed by the First District Court of Appeal and decide whether section 11.066 was intended to apply to breach of contract judgments and thus prohibits DEP from paying the judgment obtained by ContractPoint in this case.

ANALYSIS

Interpretation of Section 11.066
The question presented by the First District involves an issue of statutory interpretation, which is subject to de novo review. Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 194 (Fla.2007). Specifically, the Court must determine whether section 11.066(3), Florida Statutes (2005), applies to contract actions and bars enforcement of judgments entered on breach of contract claims against the State or its agencies if there is no specific legislative appropriation to pay the judgment. This is a case of first impression.[2]
We begin our analysis by explaining what this case is not about. We are not asked to decide whether the Legislature or the executive branch could or should place limits on the amount it will pay or when it will pay if it breaches contracts it enters into with private entities. That is not the judiciary's prerogative. The only question before us is whether section 11.066 plainly evinces an intent to shield the State from paying any valid judgment entered against it in a breach of contract action unless and until there is a specific legislative appropriation to pay that judgment.
The Florida Legislature originally enacted section 11.066 in 1991 as part of "An Act relating to fiscal affairs of the state." See ch. 91-109, § 40, Laws of Fla. Although located in a chapter dealing generally with "Legislative Organization, Procedures and Staffing," section 11.066 is entitled "Suits seeking monetary damages against the state or its agencies; payment of judgments; appropriations required" and provides:
(1) As used in this section, the term "appropriation made by law" has the same meaning as in s. 1(c), Art. VII of the State Constitution and means money allocated for a specific purpose by the Legislature by law in a general appropriations act or a special appropriations act.
(2) The state and each state agency, when exercising its inherent police power to protect the public health, safety, or welfare, is presumed to be acting to *1265 prevent a public harm. A person may rebut this presumption in a suit seeking monetary damages from the state or a state agency only by clear and convincing evidence to the contrary.
(3) Neither the state nor any of its agencies shall pay or be required to pay monetary damages under the judgment of any court except pursuant to an appropriation made by law. To enforce a judgment for monetary damages against the state or a state agency, the sole remedy of the judgment creditor, if there has not otherwise been an appropriation made by law to pay the judgment, is to petition the Legislature in accordance with its rules to seek an appropriation to pay the judgment.
(4) Notwithstanding s. 74.091,[[3]] a judgment for monetary damages against the state or any of its agencies may not be enforced through execution or any common-law remedy against property of the state or its agencies, and a writ of execution therefor may not be issued against the state or its agencies. Moreover, it is a defense to an alternative writ of mandamus issued to enforce a judgment for monetary damages against the state or a state agency that there is no appropriation made by law to pay the judgment.
(5) The property of the state, the property of any state agency, or any monetary recovery made on behalf of the state or any state agency is not subject to a lien of any kind.
(Emphasis supplied.)
This Court has long held that a "statute must be given its plain and obvious meaning." Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)). If the language of the statute is "clear and unambiguous and conveys a clear and definite meaning" there is no need to resort to statutory construction. Id.; accord Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 454 (Fla.1992). In interpreting section 11.066, however, we cannot read subsection (3) in isolation, but must read it within the context of the entire section in order to ascertain legislative intent for the provision. Id. at 455 ("Every statute must be read as a whole with meaning ascribed to every portion and due regard given to the semantic and contextual interrelationship between its parts." (quoting Fleischman v. Dep't of Prof'l Reg., 441 So.2d 1121, 1123 (Fla. 3d DCA 1983))). A "statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts" and is not to be read in isolation, but in the context of the entire section. Jones v. ETS of New Orleans, Inc., 793 So.2d 912, 914-15 (Fla. 2001) (quoting Acosta v. Richter, 671 So.2d 149, 153-54 (Fla.1996)).
In Florida State Racing Commission v. McLaughlin, 102 So.2d 574, 575-76 (Fla.1958), this Court stated:
[I]f a part of a statute appears to have a clear meaning if considered alone but when given that meaning is inconsistent with other parts of the same statute or others in pari materia, the Court will *1266 examine the entire act and those in pari materia in order to ascertain the overall legislative intent.
These principles apply to this statute. While subsection (3), standing alone, appears to be an absolute bar to the State's payment of all judgments, subsections (3) and (4) must be read with reference to subsection (2), which states:
The state and each state agency, when exercising its inherent police power to protect the public health, safety, or welfare, is presumed to be acting to prevent a public harm. A person may rebut this presumption in a suit seeking monetary damages from the state or a state agency only by clear and convincing evidence to the contrary.
§ 11.066(2), Fla. Stat. (2005) (emphases supplied).
This express reference to suits "seeking monetary damages" made in the context of the State's exercise of its "police power to protect the public health, safety, or welfare" precedes the references in subsection (3) to "monetary damages under the judgment of any court" and "a judgment for monetary damages." The reference to police power also precedes the remaining subsections that discuss execution on State property and application of mandamus to enforce such judgments. Subsection (2) clearly focuses the thrust of the statute on judgments arising from claims based on the exercise of the State's police power and says nothing about claims arising from breach of contract. The references in subsection (3) to "monetary damages" echo the provisions of subsection (2) and accordingly relate to monetary damages contained in judgments arising from the exercise of the State's police powers. Therefore, the statute does not express a clear intent to bar payment of valid breach of contract judgments, but rather expresses an intent to limit payment of judgments arising out of the exercise of the State's police powers.[4]
Moreover, "[t]o discern legislative intent, courts must consider the statute as a whole, including the evil to be corrected, the language, title, and history of its enactment, and the state of law already in existence on the statute." Bautista v. State, 863 So.2d 1180, 1185 (Fla.2003) (emphasis supplied) (quoting State v. Anderson, 764 So.2d 848, 849 (Fla. 3d DCA 2000)). When considered as a whole, with the express indication of the "evil to be corrected" in subsection (2), in the context of the broad statutory scheme conferring contracting authority upon its agencies, and in light of the legislative history of the enactment, the Legislature's apparent intent in section 11.066 is to preclude payment of judgments for monetary damages arising out of the State's exercise of its police powers unless an appropriation exists.
The legislative history of section 11.066 confirms that the provision addresses the State's exercise of its police powers. Chapter 91-109, section 40, Laws of Florida, was enacted in 1991 by the passage of House Bill 2313. The House of Representatives Committee on Appropriations Bill Analysis and Economic Impact Statement for HB 2313 (May 13, 1991) states that section 40 of the bill: "Provides that in suits seeking monetary damages against *1267 the state or its agencies, a court may not require the payment of monetary damages unless an appropriation has been made by law. Provides for a standard of clear and convincing evidence for a person to rebut the presumption that state agency, exercising its inherent police power, is acting to prevent public harm." It can be seen that the elements of the law given prominence in the staff analysis were suits for monetary damages stated in conjunction with the State's exercise of its police power. Other legislative materials relating to the original enactment of section 11.066 also suggest that one impetus for the statute was the many attempts to recover judgments for claims arising out of the State's exercise of its police powers during the Citrus Canker Eradication Program in the mid-1980s.[5]
Subsequently, the Senate Staff Analysis and Economic Impact Statement for CS/SB 822 (Apr. 5, 2001), discussing the proposed amendment of section 11.066, explains generally that the statute "relates to suits seeking monetary damages against the state or state agencies."[6] This staff analysis goes on to again explain: "When the state or a state agency is exercising its inherent police power to protect the public health, safety, or welfare, it is presumed to be acting to prevent a public harm." Immediately following this statement, the staff analysis states that "[t]he section permits payment of monetary damages under a court judgment by the state or its agencies only pursuant to an appropriation."
Nothing in either of the staff analyses or legislative history indicates in any way that the statute bars payment of breach of contract judgments entered upon legislatively authorized contracts. Instead, these legislative staff analyses, as do the other sections of the statute, focus on the police power aspect of monetary damage suits as the subject of the legislation.
Additionally, no contemporaneous amendments were enacted to limit or alter state agencies' contracting authority in the vast array of contracting statutes which then, and now, provide broad contracting authority to state agencies, including DEP.[7] And despite DEP taking the position *1268 that section 11.066 broadly applies to all judgments entered against the State, there has been no contention made that the specific statutory scheme relating to tort suits and judgments against the State pursuant to section 768.28, Florida Statutes, is affected by section 11.066.[8] In our view, this further supports the conclusion that section 11.066 was not intended to broadly limit the payment of all judgments, but only those entered against the State arising from actions it took in the exercise of its police powers.

Pan-Am as Established Precedent
Finally, the actions of the Legislature in enacting this legislation in 1991 must also be read in the context of this Court's then-existing precedent. Seven years before the 1991 enactment of section 11.066, this Court issued its opinion in Pan-Am Tobacco Corp. v. Department of Corrections, 471 So.2d 4 (Fla.1984). We held there that "[w]here the legislature has, by general law, authorized entities of the state to enter into contract or undertake those activities which, as a matter of practicality, require entering into contract, the legislature has clearly intended that such contracts be valid and binding on both parties." Id. at 5. The basis for this holding was our conclusion that "[a]s a matter of law, the state must be obligated to the private citizen or the legislative authorization for such action is void and meaningless." Id. This conclusion was also the foundation for our holding in Pan-Am that "where the state has entered into a contract fairly authorized by the powers granted by general law, the defense of sovereign immunity will not protect the state from action arising from the state's breach of that contract." Id. In reaching *1269 that result, we rejected the State's contention that "mutuality of remedy is satisfied by petitioner's opportunity to bring a claims bill before the legislature." Id.
DEP urges the Court to find that section 11.066 is a clear reassertion of limited sovereign immunity as to breach of contract judgments and a statutory prohibition of enforcement of those judgments. However, if the Legislature truly intended to reassert sovereign immunity as to breach of contract judgments in section 11.066, and to overrule clear prior precedent that has been relied on for many years by the courts of this state (as well as those entities contracting with the State), we expect that such intent would have been specifically stated within the statutory scheme or, at the very least, in the legislative history and staff analyses pertaining to the enactment  all of which are absent in this case.[9] Although absence of an expression of intent to overrule this Court's precedent is not dispositive in all cases, we presume that the Legislature would not effect so important a measure as the overruling of Pan-Am or the reassertion of sovereign immunity to contract actions without expressing a clear intention to do so. Cf. Knowles v. Beverly Enterprises-Florida, Inc., 898 So.2d 1, 9 (Fla. 2004) (recognizing that the courts must presume that the Legislature will not effect so important a measure as the repeal of a law without expressing an intention to do so).[10] Furthermore, "the legislature is *1270 presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed in the new version." Jones, 793 So.2d at 917 (emphasis supplied) (quoting City of Hollywood v. Lombardi, 770 So.2d 1196, 1202 (Fla.2000)). We conclude that section 11.066 does not express a clear intent to nullify our decision in Pan-Am and those decisions that follow it, and does not express a clear intent to reimpose any aspect of sovereign immunity as to express, written contracts entered into by the State or its agencies.
Under the principles announced in Pan-Am, a contract that grants one party the right to sue, but also affords the other party the right to declare that it has no legal obligation to pay, is void for lack of mutuality of remedy. See Pan-Am, 471 So.2d at 5. That is essentially the same situation created by an application of section 11.066 to bar payment of a validly obtained judgment arising from breach of an express, written contract. The ability to sue for damages, found to be necessary in Pan-Am to prevent the contract from being illusory, is meaningless without the ability to collect on the resulting judgment. Similar to our holding in Pan-Am that a contract that is not mutually enforceable is illusory, we hold that a contract that provides no remedy by way of enforcement of a valid judgment is also illusory.
Based on this principle, we cannot conclude that the Legislature intended for all the express, written contracts entered into by its agencies pursuant to legislatively granted general contracting authority to be illusory. We have long held that the Court should not interpret a statute in a manner resulting in unreasonable, harsh, or absurd consequences. State v. Atkinson, 831 So.2d 172, 174 (Fla.2002); see also State v. Burris, 875 So.2d 408, 414 (Fla. 2004) ("A statute's plain and ordinary meaning controls only if it does not lead to an unreasonable result."). "[S]tatutory provisions should not be construed in a manner that would lead to an absurd result." State v. Presidential Women's Ctr., 937 So.2d 114, 119 (Fla.2006) (citing Warner v. City of Boca Raton, 887 So.2d 1023, 1033 n. 9 (Fla.2004)). Nor should statutes be construed "so as to lead to untenable conclusions." Austin v. State ex rel. Christian, 310 So.2d 289, 293 (Fla.1975).
Although the dissent asserts that it is ascribing a "plain language" meaning to the statute and that the majority thwarts the clear legislative intent, the dissent adds words to subsection (3) that are not contained in the statute by concluding that the only legislative prerogative is to control the timing of payment of the judgment and not the obligation to pay the judgment. We assume that this caveat was added in order to avoid the inescapable conclusion that, without an obligation to pay the judgment, the contract would be wholly illusory. Although this caveat would place constraints on the Legislature, it does so without any standards. How long is too long? Could the Legislature pay in installments? How should or would the Legislature prioritize? What rules would the judgment creditor follow? *1271 Would it have to obtain a claims bill? The fact that these questions must be asked further reinforces our conclusion that the Legislature would never have intended the result reached by the dissent, a result that authorizes the State to avoid its validly entered contracts and the monetary consequences resulting from any breach.[11]
If we were to interpret section 11.066(3) in isolation as prohibiting payment of valid breach of contract judgments, thereby rendering express, written contracts entered into by the State under legislatively granted authority essentially illusory and unenforceable, that result would be untenable and contrary to the Legislature's overall intent. The sounder and more reasoned interpretation, viewing the statute in its entirety, in light of the overall legislative scheme of encouraging private/public partnerships, and keeping in mind the history of this provision, is that section 11.066 is not applicable to breach of contract judgments.

THIS CASE
In this case, we acknowledge that the attempted enforcement of the judgment began by ContractPoint's filing of a petition for writ of mandamus. The trial court denied the petition because under section 11.066, as interpreted by that court, no clear legal duty appeared on the part of the State or its agency to pay the judgment absent an appropriation. Contrary to the dissent's view, the issue before us is not whether the trial court properly denied the petition for writ of mandamus but rather, as set forth in the certified question, what is the correct statutory construction of section 11.066.
Faced with a definite construction of the statute, issuance of the writ of mandamus is an appropriate enforcement mechanism in this case. See City of Ocoee v. State ex rel. Harris, 155 Fla. 514, 20 So.2d 674, 675 (1945) (affirming issuance of writ of mandamus to require payment by a municipality because to deny mandamus "would be equivalent to holding that a judgment creditor of a municipality would have no available means to enforce the payment"); see also Wells v. State, 952 So.2d 582, 583 (Fla. 4th DCA 2007) (holding that the sheriff may not levy on public property and "the sole method of enforcing a judgment against a governmental entity is by way of a mandamus action"); Northern Coats v. Metro. Dade County, 588 So.2d 1016, 1017 (Fla. 3d DCA 1991) (noting that "mandamus is the only vehicle for enforcing a judgment against the government"); Navarro v. Bouffard, 522 So.2d 515, 517 (Fla. 4th DCA 1988) (holding that since a judgment creditor is not entitled to levy execution on public property, "mandamus is the proper, and indeed only, vehicle for enforcing a judgment against a governmental entity").[12]
Because the trial court did not have the benefit of the decisions of either the district court or this Court construing section 11.066, the trial court's denial of the writ was not erroneous. However, the trial *1272 court may consider issuance of a writ of mandamus on remand, in the event the DEP persists in its refusal to pay this judgment.

CONCLUSION
We note that the dissent has listed a "parade of horribles" for what might happen if the State is forced to choose between having to pay a large contract judgment or "funding critical State services that affect the whole population." Dissenting op. at 1278. We believe this type of "sky is falling" alarmist scenario, which is based on absolutely no evidence in substantiation, has no place in a statutory construction analysis. In fact, this is not a choice the State has been forced to make in any other case that has been called to our attention involving a lawful breach of contract judgment, either before or after section 11.066 was enacted in 1991. The State has been honoring its contract debts and not forcing contractors to seek a special law to obtain payment on a court-entered judgment. Indeed, a statute that would require a contractor to seek a specific legislative appropriation to obtain payment on a lawful judgment would run the risk of creating a chilling effect on business between the State and the private sector. But that would be a legislative decision to reach after weighing all the policy considerations, both pro and con. In our view, that was not the basis for the enactment of section 11.066, which provides no clear indication that the Legislature intended it to apply to breach of contract judgments.
As we have pointed out, the State has made decisions over the past decade to expand contracting authority between State agencies and private entities. The State has many options in choosing how to carry out its governmental affairs in providing services to its citizens. In this case, it chose to authorize DEP to privatize certain services, such as in the concessions contract at issue here. However, DEP breached its contract and a judgment was entered against it. Therefore, the only issue we are deciding is whether section 11.066 shields DEP from having to pay that judgment absent a specific legislative appropriation.
Having reviewed the actual language of the statute, the history of its enactment, and our prior case law, we conclude that section 11.066 was never intended to act as a shield to prevent a state agency from paying a lawful judgment arising from the breach of a contract that it was expressly authorized to enter. Accordingly, for all the reasons stated, we conclude that section 11.066 was not intended to and does not apply to valid judgments arising from the breach of a legislatively authorized express, written contract by the State or any of its agencies. Therefore, we answer the certified question in the negative, approve the decision of the First District, and remand for proceedings consistent with this opinion.
It is so ordered.
QUINCE, C.J., and ANSTEAD and LEWIS, JJ., concur. WELLS, J., dissents with an opinion, in which CANTERO and BELL, JJ., concur.
WELLS, J., dissenting.
I dissent. In answering the certified question, the majority relies heavily on this Court's decision in Pan-Am Tobacco Corp. v. Department of Corrections, 471 So.2d 4 (Fla.1984). I believe that the majority's reliance on this case is mistaken. The plain language of section 11.066, Florida Statutes (2001), is applicable in the instant case and requires the conclusion that the trial court properly denied ContractPoint's petition for a writ of mandamus. I would answer the certified *1273 question in the affirmative and quash the decision of the First District Court of Appeal in ContractPoint Florida Parks, LLC v. State, 958 So.2d 1035 (Fla. 1st DCA 2007).
The question certified by the First District asks, "Does Section 11.066, Florida Statutes, apply where judgments have been entered against the State or one of its agencies in a contract action?" ContractPoint, 958 So.2d at 1038. The majority answers that "section 11.066 was not intended to require a specific legislative appropriation before a governmental entity can be required to pay a valid judgment entered into for breach of contract with a private entity." Majority op. at 1262. However, the issue before the First District was whether the trial court erred in denying ContractPoint's petition for a writ of mandamus that sought to compel the State's Chief Financial Officer (CFO) and the Florida Department of Environmental Protection (DEP) to pay a judgment resulting from a breach of contract action. Considering the certified question in the context of the issue on appeal in this case, the First District has asked this Court to decide whether section 11.066 is to be given its plain and obvious meaning where the statute states that a valid defense to a petition for a writ of mandamus seeking to compel the State or a State agency to pay a monetary judgment is that there is not a specific appropriation made by law to pay the judgment. I would answer that section 11.066 is to be given its plain and obvious meaning, and thus the trial court did not err in denying ContractPoint's petition for a writ of mandamus.
As set out in the majority opinion, section 11.066, Florida Statutes (2001), provides in full:
(1) As used in this section, the term "appropriation made by law" has the same meaning as in s. 1(c), Art. VII of the State Constitution and means money allocated for a specific purpose by the Legislature by law in a general appropriations act or a special appropriations act.
(2) The state and each state agency, when exercising its inherent police power to protect the public health, safety, or welfare, is presumed to be acting to prevent a public harm. A person may rebut this presumption in a suit seeking monetary damages from the state or a state agency only by clear and convincing evidence to the contrary.
(3) Neither the state nor any of its agencies shall pay or be required to pay monetary damages under the judgment of any court except pursuant to an appropriation made by law. To enforce a judgment for monetary damages against the state or a state agency, the sole remedy of the judgment creditor, if there has not otherwise been an appropriation made by law to pay the judgment, is to petition the Legislature in accordance with its rules to seek an appropriation to pay the judgment.
(4) Notwithstanding s. 74.091, a judgment for monetary damages against the state or any of its agencies may not be enforced through execution or any common-law remedy against property of the state or its agencies, and a writ of execution therefor may not be issued against the state or its agencies. Moreover, it is a defense to an alternative writ of mandamus issued to enforce a judgment for monetary damages against the state or a state agency that there is no appropriation made by law to pay the judgment.
(5) The property of the state, the property of any state agency, or any monetary recovery made on behalf of the state or any state agency is not subject to a lien of any kind.
*1274 The majority acknowledges that a "statute must be given its plain and obvious meaning" and that if "the language of a statute is `clear and unambiguous and conveys a clear and definite meaning' there is no need to resort to statutory construction.'" Majority op. at 1265 (quoting Holly v. Auld, 450 So.2d 217, 219 (Fla.1984)). The majority and I part ways because I find that section 11.066 is clear and unambiguous.
Subsection (4) of section 11.066 expressly answers the question before this Court. That subsection provides that "it is a defense to an alternative writ of mandamus issued to enforce a judgment for monetary damages against the state or a state agency that there is no appropriation made by law to pay the judgment." § 11.066(4), Fla. Stat. (2001). Subsection (3) further provides that
To enforce a judgment for monetary damages against the state or a state agency, the sole remedy of the judgment creditor, if there has not otherwise been an appropriation made by law to pay the judgment, is to petition the Legislature in accordance with its rules to seek an appropriation to pay the judgment.
§ 11.066(3), Fla. Stat. (2001). There is no ambiguity in these subsections or in the statute as a whole. The Legislature speaks in broad, general terms, apparently encompassing all monetary judgments against the State. The Legislature does not qualify or limit to judgments arising from any particular cause of action its proclamation that the lack of an appropriation to pay a judgment is a defense to a writ of mandamus and that, absent an appropriation, a judgment creditor's sole remedy is to petition the Legislature. There is a complete absence of language in the statute that excludes monetary damages liquidated in a breach of contract action.
The majority holds that the statute does not apply to monetary judgments from breach of contract actions because "the statute does not express a clear intent to bar payment of valid breach of contract judgments." Majority op. at 1266. This analysis does not defer properly to the Legislature's constitutional authority to draft legislation. The statute repeatedly refers to "monetary damages under the judgment of any court" and "a judgment for monetary damages." § 11.066(3)-(4). Where the Legislature uses the term "a judgment for monetary damages" without further description or exception, this Court is obliged to read the statute as applying to all judgments for monetary damages, giving to "a judgment for monetary damages" its plain and obvious meaning. For example, in Aetna Casualty & Surety Co. v. Huntington National Bank, 609 So.2d 1315, 1316 n. 1 (Fla.1992), the Court applied the plain, literal meaning of section 324.021(9)(b), Florida Statutes (1987), which provided:
Notwithstanding any other provision of the Florida Statutes or existing case law, the lessor, under an agreement to lease a motor vehicle for 1 year or longer which requires the lessee to obtain insurance acceptable to the lessor ... shall not be deemed the owner of said motor vehicle for the purpose of determining financial responsibility for the operation of said motor vehicle....
In that case, Aetna argued that the statute only applied to long-term leases that were "automobile financing substitutes" because during the legislative debate preceding passage of the bill later codified as section 324.021(9)(b), the sponsor of the proposed bill described long term leases as "an alternative way of financing an automobile." Aetna, 609 So.2d at 1317. This Court expressly rejected Aetna's argument, stating:

*1275 In this case, the statute clearly states that "the lessor, under an agreement to lease a motor vehicle for 1 year or longer... shall not be deemed the owner" of the vehicle for purposes of determining financial responsibility for the operation of the vehicle or for the acts of the operator of the vehicle. § 324.021(9)(b), Fla. Stat. (1987). The statute places two restrictions upon the type of motor vehicle lease that would exempt the owner/lessor from liability: 1) the lease must be "for 1 year or longer"; and 2) the lease must require the lessee "to obtain insurance acceptable to the lessor which contains limits not less than $100,00[0]/$300,000 bodily injury liability and $50,000 property damage liability." Id. The statute contains no language that would restrict its application to leases which are financing substitutes, as Aetna urges. Moreover, section 324.021(9)(b) specifically states that its terms are applicable "[n]otwithstanding any other provision of the Florida Statutes or existing case law."
Aetna argues that the legislative debate evidences a legislative intent that section 324.021(9)(b) only applies to long-term leases which are financing substitutes. On the contrary, legislative intent must be determined primarily from the language of the statute. It must be assumed that the legislature knows the meaning of the words and has expressed its intent by the use of the words found in the statute. S.R.G. Corp. v. Department of Revenue, 365 So.2d 687 (Fla.1978). The legislative history of a statute is irrelevant where the wording of a statute is clear. Maryland Casualty Co. v. Sutherland, 125 Fla. 282, 169 So. 679 (1936).
Aetna, 609 So.2d at 1317; see also O'Leary v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 757 So.2d 624, 627 (Fla. 5th DCA 2000) (finding that statutory language stating that "the administrative law judge has exclusive jurisdiction to determine whether a claim filed under this act is compensable" included jurisdiction to determine notice issues because "[n]otably, the determination of the adequacy of notice is not excluded from the duties of the administrative law judge"). In the instant case, the Court, in accord with abundant precedent on statutory construction, must trust that the Legislature knows the meaning of the words "a judgment for monetary damages" and has expressed its intent by the use of those words. The Legislature does not have an obligation to clarify that when it used the words "a judgment for monetary damages," it intended for that phrase to include monetary judgments from breach of contract actions. Rather, the Court has an obligation to apply the statute as written.
Similarly, even if the majority is correct in believing that citrus canker litigation inspired the drafting of section 11.066, there is no qualification in the statute limiting its effect to judgments arising from citrus canker-related causes of action. Subsection (2) discusses a plaintiff's burden of proof in an action challenging the State's use of its inherent police power, but the subsection does not discuss the process of executing a monetary judgment, the issue currently at hand. This Court is not at liberty to read extra provisions into a statute. The Legislature could have excluded monetary judgments from breach of contract actions and narrowed section 11.066 to judgments arising from the State's use of its police power mentioned in subsection (2), but it did not. In subsections (3) and (4), the Legislature defined the method by which a judgment creditor may enforce a judgment for monetary damages against the State or a state agency, and this Court must apply those dictates to all judgments for monetary damages *1276 unless and until told to do otherwise by the Legislature. Again, "[t]he legislative history of a statute is irrelevant where the wording of a statute is clear." Aetna, 609 So.2d at 1317.
The First District and the majority of this Court also determined that section 11.066 should be found inapplicable to judgments arising from breach of contract actions in part because the statute does not express a legislative intent to overturn twenty-two years of case law subjecting the State to breach of contract actions. ContractPoint, 958 So.2d at 1037; majority op. at 1268-70. Again, I disagree and would apply the plain language of section 11.066.
First, I disagree with the majority's theoretical approach. Where the plain language of a statute overturns the effect of prior case law, no express legislative finding of intent to replace the common law rule is necessarily required. Statutory language itself can overturn common law. See, e.g., Burchfield v. Realty Executives, 971 So.2d 138, 139 (Fla. 5th DCA 2007) (finding statute providing that transaction broker "does not represent [buyer or seller] in a fiduciary capacity" replaced fiduciary duty owed by real estate brokers at common law without requiring express statement of intent to abrogate common law). Detailed legislative findings such as those included in chapter 2004-93, section 1, Laws of Florida, see majority op. at 1269-70 n. 10, are helpful and informative where a statute would otherwise be subject to multiple meanings but gratuitous where the statutory language is clear.
Second, I disagree with the majority's assessment of the relationship between section 11.066 and this Court's decision in Pan-Am Tobacco. The statute and the decision are not in conflict. The majority opinion relies on Pan-Am Tobacco to answer the certified question, but Pan-Am Tobacco does not address the issue raised in this case. Pan-Am Tobacco decided that by empowering State agencies to enter into contracts, the Legislature expressed intent to abrogate the State's sovereign immunity relating to breach of contract actions. The Court held that where the State enters into a contract authorized by general law, the defense of sovereign immunity does not protect the State from an action arising from the State's breach of that contract. Id. at 5. The Court reasoned that the State and its agencies must be subject to the authority of the court system to enter judgments adjudicating contract disputes because it found that the mere "chance to seek an act of grace from the legislature" was insufficient to create the mutuality of obligation needed to form a binding contract. Id. Pan-Am Tobacco unquestionably established the right of contracting entities like ContractPoint to sue State agencies like DEP in contract. Importantly, however, the Pan-Am Tobacco decision did not address the distinct issue of whether the Legislature abrogated the State's sovereign immunity in the context of a separate legal proceeding to enforce a judgment from a breach of contract action.[13] Accordingly, section 11.066 addressed a distinct legal issue and did not overrule *1277 Pan-Am Tobacco.[14]
Furthermore, contrary to the majority, I do not find that recognizing and applying the Legislature's decision to maintain sovereign immunity in the context of proceedings to execute judgments would render illusory all State contracts since 1991. See majority op. at 1270. In any contractual setting there is a risk that a breaching party may lack the resources needed to pay a judgment. The possibility that a party may ultimately turn out to be "judgment proof" does not render the contract a nullity. The likelihood that a judgment debtor will pay a legally binding judgment in the event of a breach is a practical factor to be considered when entering any contract but not a legally required element of a contract. Applying the plain language of section 11.066(4) would not relieve the State from obligations assumed by contract. Instead, it would permit the Legislature to choose the time and manner by which it will pay outstanding judgments by allowing the State to argue the lack of an appropriation as a defense in a mandamus proceeding, thereby preserving the Legislature's constitutionally granted authority over the State's budget. See Spangler v. Fla. State Turnpike Auth., 106 So.2d 421, 424 (Fla.1958) ("[T]he immunity of the sovereign is a part of the public policy of the state. It is enforced as a protection of the public against profligate encroachments on the public treasury.").
Arguably, the majority's decision that section 11.066 is not a defense to a mandamus proceeding to enforce a monetary judgment arising from a breach of contract action leads to an absurd result. While the majority seems to hold that a party may successfully seek a writ of mandamus to compel the State to pay a judgment where no appropriation has yet been made to pay that judgment, the majority does not address the First District's concern about how the CFO or DEP will be able to disburse legally public funds to pay the judgment if not authorized to do so by an appropriation or an express constitutional directive. See art. VII, § 1(c) ("No money shall be drawn from the treasury except in pursuance of appropriation made by law."). There is also a very real question as to who is the correct recipient of a writ of mandamus to compel payment of a money judgment. As David K. Miller and M. Stephen Turner discuss in their article Enforcement of Money Judgments Against the State:
It is normally to be expected that the budget authorities of the executive and legislative branches will honor a budget transfer or appropriation request from an agency head acting under a court judgment obligation or a writ of mandamus. However, the compliance of these parties is not guaranteed. A single writ of mandamus may, therefore, be ineffective to do the entire job, and it may be necessary to request a series of such writs: initially to the head of the defendant agency to request funding by budget transfer or additional appropriation and to take necessary steps to pursue that funding; and thereafter to the Administration Commission to approve budget transfers; to the agency head to submit necessary payment vouchers to the Comptroller; to the comptroller to issue a warrant (check) for payment, and to the Treasurer to pay the warrant.
David K. Miller & M. Stephen Turner, Enforcement of Money Judgments *1278 Against the State, Fla. Bar J., July/August 1990 at 29, 31 (footnotes omitted). Miller and Turner further posit that the "ultimate writ of mandamus, in theory, would command the legislature to raise and appropriate sufficient funds to pay the judgment, pursuant to the legislature's constitutional duty to raise sufficient funds to defray state expenses within the fiscal period." Id. at 33 n. 21. Thus, if the trial court issues a writ of mandamus on remand, who is to pay this judgment and from what coffer?
In the instant case, the judgment entered against DEP was for $628,543. Perhaps if judicially compelled, DEP will be able to find $628,543 in its budget to pay the judgment, but the majority's decision fails to fully consider the eventuality of much larger judgments against the State. The majority's decision in some cases will force an agency head or the CFO to choose between paying a judgment and allowing money to be disbursed or used for the purpose for which it was appropriated. In the event of a multi-million dollar judgment, the choice could be between paying the judgment to compensate the injured individuals and funding critical State services that affect the whole population. Given the reality that State budgets are not unlimited, I do not see how payment of the judgment outside of a specific appropriation can be characterized as the sort of ministerial, nondiscretionary act appropriately enforced by writ of mandamus against a State official. The State Constitution vests that sort of discretionary decision-making in the Legislature, which consists of elected officials accountable to their constituents, not in the courts or in officers of the executive branch. The Legislature has the authority and the duty to prioritize how and when judgments are paid.[15]
Finally, I do not find that maintaining sovereign immunity as it relates to the collection of a judgment would render the right to sue for damages "meaningless." Majority op. at 1270. The contract action is the injured party's opportunity to prove the existence and terms of its contract, the fact of the State's breach, and the amount of damages. The contract suit allows the aggrieved party to establish that it has a "clear legal right" to damages. Cf. Coldiron v. Seminole County Sheriff's Dept., 936 So.2d 42, 43 (Fla. 5th DCA 2006) ("Mandamus may not be used to establish *1279 rights.... Instead, a party petitioning for a writ of mandamus must establish a clear legal right to the requested relief...."). Under the scheme set forth in section 11.066, the contract action is an important step toward recovery by means of a petition for a writ of mandamus where the Legislature has appropriated funds to compensate an injured party or by means of a petition in the Legislature where it has not yet appropriated funds to pay the judgment.
In conclusion, I think that the majority has erred by straying from our duty to apply the plain language of unambiguous statutes and by disregarding the distinction between a breach of contract action and post-judgment litigation to enforce a judgment. I would answer the certified question in the affirmative and quash the decision of the First District. The trial court did not err in denying ContractPoint's petition for a writ of mandamus on the basis that pursuant to section 11.066, the CFO did not have a clear legal duty to pay the judgment without an appropriation for that purpose.
CANTERO and BELL, JJ., concur.
NOTES
[1] This specific authority, in effect when the contract was executed, was first granted in 1949 to DEP's predecessor agency in section 592.07, Florida Statutes (1949). The provision was later transferred to section 258.007, Florida Statutes (1979).
[2] Of particular note, we are neither aware of, nor have we been provided with, any cases in which the State has sought to avoid enforcement of a judgment based on section 11.066, since the provision was enacted in 1991.
[3] The exception in section 74.091, Florida Statutes (2007), is not applicable here. That statute provides that where title to property taken in eminent domain has passed to the condemning authority, and the condemning authority does not pay into the court the full amount of compensation due for the taking as determined by the jury, then those persons entitled to the compensation "may sue out execution, in the event a timely appeal has not been filed, and such execution may be levied upon the property so condemned and any other property of the petitioner in the same manner as executions are levied in common-law actions." § 74.091, Fla. Stat. (2007).
[4] In fact, the only other Florida case that has discussed section 11.066 is Haire v. Florida Department of Agriculture & Consumer Services, 870 So.2d 774 (Fla.2004), in which this Court noted that the State had conceded that a statutory provision attempting to limit compensation for citrus trees removed in the citrus canker eradication program to funds that had been specifically appropriated for such purpose (section 581.1845, Florida Statutes (2003)), "is nothing more than a reiteration of the language in section 11.066(3)." Id. at 785.
[5] The tape recording of proceedings held March 14, 1991, by the Senate Appropriations Committee, discussing C/S for SB 2128, a bill which contained similar provisions to those codified in section 11.066, and for which HB 2313 was substituted, discloses a specific discussion of the citrus canker claims as the impetus for the legislation, noting that the judicial branch had awarded judgments for citrus canker activities by the State. Fla. S. Comm. on Approp. tape recording of proceedings (March 14, 1991) (available at Fla. Dep't of State, Div. of Archives, Tallahassee, Fla.). Citrus canker litigation and judgments have existed in Florida since the mid-1980s. In Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 521 So.2d 101, 105 (Fla.1988), this Court held that the State has police power authority to destroy healthy but suspect citrus plants but may not do so without compensation. The citrus canker litigation that commenced in the 1980s has continued to the present. See, e.g., Fla. Dep't of Agric. & Consumer Servs. v. Cox, 947 So.2d 561 (Fla. 4th DCA 2006) (class action brought by owners to recover compensation from the Department of Agriculture because of its destruction of canker-exposed citrus trees under the Citrus Canker Eradication Program).
[6] The amendment enacted in 2001 added subsection (5), which prohibits liens upon state property. Ch. 2001-266, § 1, at 2805, Laws of Fla.
[7] Other state agencies have been given contracting authority by the Legislature over the years in many statutes. See, e.g., § 253.025(7)(b), Fla. Stat. (2007) (Board of Trustees of the Internal Improvement Trust Fund or state agency to contract for real estate acquisition services); § 255.503(9), Fla. Stat. (2007) (Dep't of Management Services); § 255.513(1), Fla. Stat. (2007) (Div. of Bond Finance); § 337.11, Fla. Stat. (2007) (Dep't of Transportation); § 338.2216(1)(b), Fla. Stat. (2007) (Florida Turnpike Enterprise); § 402.7305, Fla. Stat. (2007) (Dep't of Children and Family Services); § 409.908(18), Fla. Stat. (2007) (Agency for Health Care Administration for transportation services); § 944.105(1), Fla. Stat. (2007) (Dep't of Corrections).

Other statutes enacted since 11.066 are consistent with an expansion of the State's contracting authority. For example, section 255.05(9), Florida Statutes (2007), relates to public works contracts entered into on or after July 1, 1999, and provides:
On any public works project for which the public authority requires a performance and payment bond, suits at law and in equity may be brought and maintained by and against the public authority on any contract claim arising from breach of an express provision or an implied covenant of a written agreement or a written directive issued by the public authority pursuant to the written agreement. In any such suit, the public authority and the contractor shall have all of the same rights and obligations as a private person under a like contract except that no liability may be based on an oral modification of either the written contract or written directive.
This statute provides for the mutuality of the rights, obligations, remedies and defenses of parties to a public service contract as was discussed in County of Brevard v. Miorelli Engineering, Inc., 703 So.2d 1049, 1050-51 (Fla. 1997).
[8] The dissent suggests our analysis cannot be reconciled with section 768.28, in which an injured party is required to seek a legislative claims bill to recover payment for additional compensation for tort judgments over and above the limited waiver of sovereign immunity provided in that statute. Dissenting op. at 1278 n. 15. Indeed, the Legislature has actually authorized payment of up to $200,000 per incident without recourse to a legislative claims bill. However, tort judgments and breach of contract judgments, and the methods of payment for each, are in no way comparable. The point that we have repeatedly made is that the State can determine what limits to place on valid and binding contracts at the time it enters into the contract. To the contrary, the amount of tort judgments or for that matter the amount of judgments arising out of the exercise of its police power may be difficult to assess and are unpredictable, reinforcing our conclusion of the narrow intended reach of section 11.066.
[9] This Court has repeatedly followed the principles of Pan-Am. See Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp., 908 So.2d 459, 474 (Fla.2005) (reiterating that "[w]here the legislature has, by general law, authorized entities of the state to enter into contract ... the legislature has clearly intended that such contracts be valid and binding on both parties" (quoting Pan-Am, 471 So.2d at 5)); Provident Mgmt. Corp. v. City of Treasure Island, 796 So.2d 481, 486 (Fla.2001) (reiterating the principle that where the State has entered into a contract fairly authorized by the powers granted by general law, the defense of sovereign immunity will not protect the State from action arising from the State's breach of that contract); Miorelli, 703 So.2d at 1051 (extending Pan-Am to include implied terms of contract because it would be inconsistent to allow the State to be liable for only express terms of contract while the private party is liable for both express and implied terms of contract, although concluding sovereign immunity would still bar work that is "totally outside" the contract); State v. Family Bank of Hallandale, 623 So.2d 474, 479 (Fla. 1993) (stating the principle that where the State has entered into an authorized contract, sovereign immunity will not bar an action for breach of contract); Broward County v. Finlayson, 555 So.2d 1211, 1213 (Fla. 1990) (finding that Pan-Am "controls" the issue and sovereign immunity does not prohibit an award of prejudgment interest against a subdivision of the State in a class action by emergency medical technicians for overtime pay pursuant to a collective bargaining agreement).

District courts have also applied the principles set forth in Pan-Am. See, e.g., Leon County v. Stephen S. Dobson, III, P.A., 957 So.2d 12, 13-14 (Fla. 1st DCA 2007) (citing Pan-Am for the principle that when a party reserves the option not to perform under a contract, the contract is a nullity); Grading & Bush Hog Servs., Inc. v. Fla. Dep't of Transp., 894 So.2d 1047, 1049 (Fla. 5th DCA 2005) (rejecting DOT's claim that section 337.19, requiring that suit be brought on a contract within 820 days, was a "limited sovereign immunity statute" because Pan-Am held sovereign immunity is waived for express contracts); White Constr. Co. v. State Dep't of Transp., 860 So.2d 1064, 1067 (Fla. 1st DCA 2003) (same).
[10] An example of the Legislature's clearly expressed intention to override a prior judicial construction is seen in section 810.015, Florida Statutes (2004), in which the Legislature expressly stated:

(1) The Legislature finds that the case of Delgado v. State, 776 So.2d 233 (Fla.2000), was decided contrary to legislative intent and the case law of this state relating to burglary prior to Delgado v. State. The Legislature finds that in order for a burglary to occur, it is not necessary for the licensed or invited person to remain in the dwelling, structure, or conveyance surreptitiously.
(2) It is the intent of the Legislature that the holding in Delgado v. State, 776 So.2d 233 (Fla.2000) be nullified. It is further the intent of the Legislature that s. 810.02(1)(a) be construed in conformity with Raleigh v. State, 705 So.2d 1324 (Fla. 1997); Jimenez v. State, 703 So.2d 437 (Fla.1997); Robertson v. State, 699 So.2d 1343 (Fla.1997); Routly v. State, 440 So.2d 1257 (Fla. 1983); and Ray v. State, 522 So.2d 963 (Fla. 3rd DCA 1988). This subsection shall operate retroactively to February 1, 2000.
Ch. 2004-93, § 1, at 591, Laws of Fla. (legislative strike-outs and underlining omitted).
[11] Clearly, when contracts are entered into between private entities there is always a risk of nonpayment but that possibility is not part of the original intent of the contracting parties. We also emphasize that when the State enters into a contract with a private entity, it can place parameters on the payment of damages as we have previously pointed out. However, the only question before us is whether section 11.066 plainly evinces an intent to shield the State from payment of all valid judgments entered against it in breach of contract actions unless and until there is a specific legislative appropriation to pay that judgment.
[12] It has long been, and continues to be, the law of this State that levy and execution may not be had against public property.
[13] Until the First District's decision in the instant case, no appellate court had extended Pan-Am Tobacco to a proceeding to enforce a judgment against the State. In each of the cases cited by the majority in footnote 9, the lawsuit was brought to establish the State's liability for damages or interest, generally under a tort or contract theory. None concerned an action to enforce a judgment. As the majority acknowledges, the applicability of section 11.066 to an action to enforce a judgment against the State appears to be an issue of first impression.
[14] Moreover, if conflict exists between section 11.066 and Pan-Am Tobacco, the Legislature can replace common law with a duly enacted statute. See art. X, § 13, Fla. Const. ("Provision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating.").
[15] The majority also does not reconcile today's holding with this Court's application of legislation regarding the payment of tort judgments. In section 768.28, Florida Statutes (2007), the Legislature obligated the State and its agencies to pay tort judgments up to $100,000 per individual, not to exceed $200,000 per incident. In addition to creating a limited waiver of sovereign immunity relating to execution of tort judgments, the statute expressly provided that "a judgment or judgments may be claimed and rendered in excess of these amounts" and that the "portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature." § 768.28(5), Fla. Stat. (2007) (emphasis added). This Court has strictly construed prior versions of section 768.28, holding that payment of any kind in excess of the statutory caps could only be obtained through the Legislature. See, e.g., City of Lake Worth v. Nicolas, 434 So.2d 315 (Fla. 1983); Berek v. Metro. Dade County, 422 So.2d 838 (Fla. 1982). In those cases, the Court expressed no concern about the feasibility of seeking redress before the Legislature and abided by the long established principles that "[i]n Florida, sovereign immunity is the rule, rather than the exception," Pan-Am Tobacco, 471 So.2d at 5, and that any waiver of sovereign immunity must be strictly construed, Spangler, 106 So.2d at 424. Yet, today in order to avoid an "untenable" result, majority op. at 1271, the majority finds that a petitioner may compel payment of a judgment absent an appropriation in a context where the Legislature has not waived the State's immunity by statute.