DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

NATHAN SHIRL HART,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D2023-0493

_____

November 7, 2025

Appeal from the Circuit Court for Hillsborough County; Laura E. Ward, Judge.

Lisa B. McLean, Public Defender, and Richard N. Asfar, Assistant Public Defender, Tampa, for Appellant.

James Uthmeier, Attorney General; Henry C. Whitaker, Solicitor General (withdrew after briefing); Alison Elena Preston, Deputy Solicitor General (withdrew after briefing); and Jeffrey Paul DeSousa, Chief Deputy Solicitor General, Tallahassee; and William C. Shelhart, Assistant Attorney General, Tampa, for Appellee.

Paul M. Goodrich (withdrew after briefing) and Wesley A. Butensky of Reed Smith LLP, Miami (substituted as counsel of record) and M. Patrick Yingling of Reed Smith LLP, Chicago, Illinois (withdrew after briefing), for Amicus Curiae Niskanen Center.

Catherine Kingsley Wettach; William Ossoff; and Hassan Ahmad of Covington & Burling LLP, Washington, DC; Brendan Parets of Covington

& Burling LLP, Washington, DC (withdrew after briefing), for Amicus Curiae Faith-Based Organizations and Religious Leaders.

Patrick O'Bryant, of Messer Caparello, P.A., Tallahassee; Andrew Frackman, Danielle Feuer, Harrison Meyer of O'Melveny & Myers LLP, New York, New York; Patrick Jones of O'Melveny & Myers LLP, Washington, DC; and Patrick O'Bryant, Tallahassee, for Amici Curiae Brennan Center for Justice at NYU School of Law and NAACP Legal Defense and Educational Fund, Inc.

Samuel G. Williamson and Thomas S.P. Geeker of Quinn Emanuel Urquhart & Sullivan, LLP, Miami, for Amicus Curiae The Association of Prosecuting Attorneys.

Reid Levin, Raúl L. Martínez, and Robert C. Josefsberg of Reid Levin, PLLC, Boca Raton; and Dean L. Chapman, Jr., and Andrew A. McWhorter of Akin Gump Strauss Hauer & Feld LLP, New York, New York, for Amici Curiae Former Members of the Commission on the Statewide Prosecution Function.

Matthew R. Tuchman, Washington, DC, for Amici Curiae Due Process Institute and Former Florida Senator Jeff Brandes.

Freddy Funes of Toth Funes PA, Miami; Eyitayo St. Matthew-Daniel, Jonathan H. Hurwitz, and Michael S. Dauber of Paul, Weiss, Refkind, Wharton & Garrison LLP, New York, New York (withdrew after briefing); and Jane Yang of Paul, Weiss, Refkind, Wharton & Garrison LLP, New York, New York (withdrew after briefing), for Amicus Curiae Florida Rights Restoration Coalition.

NORTHCUTT, Judge

The Office of the Statewide Prosecutor (OSP) charged Nathan Shirl Hart with making a false affirmation in connection with an election and with voting by an unqualified elector. A jury convicted him of the former and acquitted him of the latter. We conclude that the OSP lacked jurisdiction to prosecute Hart because his alleged crimes occurred only in a single circuit. Therefore, we reverse Hart's judgment and sentence.

Many years before the events at issue in this case, Hart was convicted of a felony, and for that reason he was disqualified to vote until and unless his voter rights were restored. *See* art. VI, § 4(a), Fla. Const. (2004). Afterward, a 2018 ballot initiative amended article VI, section 4, to provide for the automatic restoration of voter rights to citizens convicted of certain offenses upon completion of their sentences or parole. But the amendment expressly excluded the offense for which Hart had been convicted. Thus, he was ineligible for the automatic restoration of his rights.

After completing his sentence in 2019, Hart did not seek restoration of his voting rights. But in 2020, at a voter registration table outside a Department of Highway Safety and Motor Vehicles office in Hillsborough County, he registered to vote.[1] Hart completed a registration application form that required him to make two relevant affirmations. First, he checked the box next to the following statement: "If I have been convicted of a felony, I affirm my voting rights have been restored pursuant to s. 4, Art. VI of the State Constitution upon the completion of all terms of my sentence, including parole or probation." Second, Hart signed an oath at the foot of the document: "I do solemnly swear (or affirm) . . . that I am qualified to register as an elector under the Constitution and the laws of the State of Florida, and that all information provided in this application is true."

---

[1] At trial, Hart testified that he was approached by someone at the table who told him that he might be eligible to vote based on the new amendment and should fill out an application. This person told Hart that if he was not eligible, he would not receive a voter registration card. Ultimately, the veracity of Hart's defense is not a factor in our analysis of the issue before us.

3

The Hillsborough County Supervisor of Elections later sent Hart a voter registration card, and he voted in the November 2020 general election at a polling place in Hillsborough County.

In 2022, the OSP filed a criminal information against Hart in the Thirteenth Circuit stemming from his voter registration application and his vote in the November 2020 election. In count I, the OSP alleged that Hart "did willfully affirm falsely to an oath or affirmation in connection with or arising out of voting or elections, contrary to Section 104.011(1) Florida Statutes." In count II, the OSP alleged that Hart "did willfully vote in an election knowing that he is not a qualified elector, contrary to Section 104.15, Florida Statutes." Hart eventually moved to dismiss pursuant to Florida Rule of Criminal Procedure 3.190(b), contending that the OSP lacked jurisdiction to prosecute him for the alleged crimes. The circuit court denied the motion.

Three district courts of appeal have addressed the OSP's jurisdiction to prosecute under materially identical scenarios. In *State v. Hubbard*, 392 So. 3d 1067, 1072–1073 (Fla. 4th DCA 2024), *rev. granted* 2025 WL 79096 (2025), and *State v. Miller*, 394 So. 3d 164, 170 (Fla. 3d DCA 2024), divided panels of the Third and Fourth Districts reinstated prosecutions that had been dismissed by circuit courts on the ground that the OSP lacked jurisdiction. In *State v. Washington*, 403 So. 3d 465, 479–480 (Fla. 6th DCA 2025), the Sixth District held that the OSP had no jurisdiction under such circumstances, and therefore, it affirmed an order dismissing the prosecution. We agree with *Washington* and with the dissents in *Hubbard* and *Miller*, and thus we conclude that the OSP had no jurisdiction to prosecute Hart for the crimes charged against him.

The OSP was established in article 4, section 4(b) of the Florida Constitution, which delineates its authority:

4

> There is created in the office of the attorney general the position of statewide prosecutor. The statewide prosecutor shall have concurrent jurisdiction with the state attorneys to prosecute *violations of criminal laws occurring or having occurred, in two or more judicial circuits as part of a related transaction,* or when any such offense *is affecting or has affected two or more judicial circuits as provided by general law.*

(Emphasis added). Consequently, there are two constitutional circumstances in which the OSP has concurrent prosecutorial jurisdiction with local state attorneys. "Occurrence" jurisdiction applies to crimes that take place in two or more judicial circuits as part of a related transaction. If provided by law, "effects" jurisdiction applies to crimes that affect two or more judicial circuits.

When Hart was prosecuted, the legislature had enacted a statute granting the OSP authority to investigate and prosecute a variety of offenses, including "any crime involving voter registration, voting, or candidate or issue petition activities." § 16.56(1)(a), Fla. Stat. (2022). However, this authority was limited: The OSP was empowered to prosecute such activities "only when any such offense is occurring, or has occurred, in two or more judicial circuits as part of a related transaction, or when any such offense is connected with an organized criminal conspiracy affecting two or more judicial circuits." *Id.* Thus, the statute repeated the constitutional grant of occurrence jurisdiction. It further endowed the OSP with effects jurisdiction, but only with respect to crimes connected with organized criminal conspiracies.

The statute imposed another requirement: "Informations or indictments charging such offenses shall contain general allegations stating the judicial circuits and counties in which crimes are alleged to have occurred or the judicial circuits and counties in which crimes affecting such circuits or counties are alleged." *Id.*

5

The information against Hart alleged facts consistent with the OSP's occurrence jurisdiction; i.e., it charged that Hart committed crimes "in the Thirteenth and Second Judicial Circuits of Florida, to wit: Hillsborough and Leon Counties, Florida, as part of a related transaction occurring in two or more judicial circuits." But the undisputed facts upon which Hart's motion to dismiss was founded demonstrated that the crimes with which he was charged occurred entirely within the Thirteenth Circuit. An offense is complete upon the occurrence of all elements of the crime. *Sanders v. State*, 77 So. 3d 914, 915–916 (Fla. 4th DCA 2012).[2] Hart's alleged violation of section 104.011(1) was complete when he "[swore] or affirm[ed]" to the representations in his voter registration application. His alleged violation of section 104.15 was complete when he voted in the November 2020 election. Both charged crimes began and ended in Hillsborough County. Manifestly, the crimes alleged against Hart occurred in but one circuit. As such, they were insufficient to confer jurisdiction on the OSP.

In its traverse to the motion to dismiss, OSP ventured that Hart's Hillsborough crimes were part of a related transaction in the Second Circuit. This is because the Hillsborough supervisor of elections transmitted Hart's voter registration information to the Florida Division of Elections in Leon County for verification and the supervisor

---

[2] In *Sanders v. State*, 77 So. 3d 914, 915–916 (Fla. 4th DCA 2012), the defendant committed theft during a flight from Phoenix, Arizona, to Ft. Lauderdale, Florida. She was charged and convicted in Florida, but her conviction was overturned. The court ruled that because every element necessary for the charged offense occurred before the defendant's plane entered Florida airspace, even though the flight continued to a landing in Florida (where presumably the defendant hoped to get away), the offense did not occur in Florida.

transmitted Hart's ballot to the division for tabulating.[3]  The State maintains this position on appeal, and it was the basis of the analyses by the Third and Fourth Districts in *Miller* and *Hubbard*.  But this position ignores the plain language in the constitution and statute that requires the commission of *crimes* in more than one circuit, and it conflates that requirement with the second proviso that the *crimes* in two or more circuits must be part of a related transaction.

Instead, we agree with *Washington*, and with Judge Scales's dissent from the *Miller* decision and with Judge May's dissent in *Hubbard*.  The mere happening of a transaction related to a crime in a single circuit does not vest the OSP with jurisdiction unless the related transaction includes a crime in another circuit.  To hold otherwise would be an unwarranted expansion of the OSP's jurisdiction notwithstanding the specific limiting language of the constitution and statute.  *See Washington*, 403 So. 3d at 474 ("[T]he OSP's occurrence jurisdiction depends on a multi-circuit offense ('occurring' in multiple circuits) that is also part of a multi-person venture or undertaking connected to the offense ('part of a related transaction')."); *Miller*, 394 So. 3d at 172–173 (Scales, J., dissenting) (bemoaning the majority's "expansive interpretive approach" whereas the statute only "*narrowly* authorizes OSP involvement"); *Hubbard*, 392 So. 3d at 1073 (May, J., dissenting) (complaining that the majority allows the OSP to "extend its reach farther

---

[3] These assertions were not strictly accurate.  Evidence at trial showed that the Hillsborough County Supervisor of Elections sent the *driver license and social security information* set forth on Hart's registration application for verification by the division of elections pursuant to section 97.053(6), Florida Statutes (2020).  Further, the votes in Hillsborough County were tabulated *locally*.  Only the resulting totals for federal or state offices were conveyed to the division.  *See* §§ 102.071, 102.112, Fla. Stat. (2020).

than my reading of the Florida Constitution and applicable statutes allow").

Obviously, the activities of the Department of State in this case were not crimes. Thus, because in Hart's case there were no alleged criminal violations in two or more judicial circuits, there is no occasion for us to determine whether the department's involvement in the electoral process could be deemed a related transaction for these purposes.[4] *Cf. Washington*, 403 So. 3d at 475 ("Because Washington's alleged offense occurred in only one circuit, we do not have to decide whether it was also part of a related transaction."); *Miller*, 394 So. 3d at 172 (Scales, J., dissenting) (stating that "the inquiry ends" when the defendant's charged criminal act did not occur in more than one judicial circuit). To read these provisions differently would render parts of them meaningless. *See Hillsborough Cnty. by & through Bd. of Cnty. Comm'rs v. Sch. Bd. of Hillsborough Cnty.*, 395 So. 3d 1116, 1118 (Fla. 2d DCA 2024) (quoting *Florida Department of Environmental Protection v. Contractpoint Florida*

---

[4] The authorities cited by the State in support of its "related transaction" argument are inapposite because all of them involved criminal activity occurring in more than one circuit. For example, in *King v. State*, 790 So. 2d 477 (Fla. 5th DCA 2001), the Fifth District held the OSP had authority to prosecute local burglaries carried out for the purpose of funding a multi-district motorcycle chop shop operation. In *Thomas v. State*, 125 So. 3d 874 (Fla. 4th DCA 2013), there was an organized criminal conspiracy with predicate acts committed in multiple judicial circuits. In *State v. Tacher*, 84 So. 3d 1131 (Fla. 3d DCA 2012), there was an extensive multi-district drug trafficking, money laundering, and racketeering ring with codefendants receiving, transporting, and selling drugs throughout the state. In *Snyder v. State*, 715 So. 2d 367 (Fla. 5th DCA 1998), the defendant swindled victims selling items in the newspaper in four judicial circuits using counterfeit cashier's checks he prepared on the same typewriter as part of a single scheme. Hart, conversely, went to one DHSMV office by himself and one polling place by himself, both of which were in a single judicial circuit.

8

*Parks, LLC*, 986 So. 2d 1260, 1265 (Fla. 2008), for the proposition that "[a] statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts and is not to be read in isolation, but in the context of the entire section.")).

Neither do we agree with the State's claim that the statutory amendment could expand the OSP's jurisdiction after Hart's jury trial. The trial occurred on February 7, 2023, and the jury returned its verdict that day. Effective February 15, 2023, before the trial court entered its judgment and sentence, section 16.56 was amended to include a new subsection specifically addressing specified voting-related offenses. Ch. 2023-2, Laws of Fla. The amendment removed the criminal conspiracy element for this class of crimes. Instead, the amended statute states that "[t]he office shall have such power [to investigate and prosecute those voting offenses] only when any such offense is occurring, or has occurred, in two or more judicial circuits as part of a related transaction, *or when any such offense is affecting, or has affected, two or more judicial circuits*." *Id.* (emphasis added).

The State argues that the revised statute is retroactively applicable to Hart's case and that his conviction may be affirmed on that ground. Indeed, in *Hubbard* the majority held that the 2023 amendment was retroactive, and it reversed the dismissal of charges in part on that basis. The *Miller* majority, having concluded that the OSP had jurisdiction under the pre-amended version of the statute, declined to address whether the amendment was retroactive. The amended statute took effect two days after the information was dismissed in *Washington*. The Sixth District held that because the State had not moved to amend the information or otherwise raised the application of the new statute in the trial court, its applicability was not preserved for appeal.

9

The State's argument here is similarly unavailing. Applying the 2023 statutory amendment to Hart's case would have necessitated amending the information against him to allege this basis for the OSP jurisdiction, as required by the statute. *See* § 16.56(1)(c), Fla. Stat. (2023). Under Florida Rule of Criminal Procedure 3.140(j), an information may be amended on motion to the trial court prior to trial—and under some circumstances courts have approved amendments even during trial. *See State v. Mulvaney*, 200 So. 3d 93, 96 (Fla. 5th DCA 2015). But the State has not given us an example of an information being amended well after the trial, after the entry of judgment and sentence, and after the taking of an appeal. In any event, the OSP never moved the trial court for leave to amend the information in this case, and the State cites no rule of law that authorizes us to order it done after-the-fact.

Regardless, we conclude that the facts of this case did not fall within the statutory amendment providing for OSP jurisdiction when a voting crime in a single circuit has "affected" another circuit. The extra-circuit "effect" relied upon by the OSP was the involvement of the Department of State when verifying the driver's license and Social Security numbers on Hart's voter registration application and when accepting the voting tallies from the Hillsborough supervisor of elections. The *Hubbard* majority subscribed to this theory. "[S]ubmitting a fraudulent voter registration in Broward County is an act which requires subsequent involvement of the Secretary of State in Leon County," the court wrote. *Hubbard,* 392 So. 3d at 1073. "So too does voting in an election in Broward County. As a result, the OSP had the authority to charge Hubbard with these crimes." *Id.* The *Hubbard* majority went

10

even further, positing that "voter fraud impacts the public's confidence in elections throughout the state." *Id.*

But the common meaning of *affect* is something more than the mere tangential performance of a regular agency function in the normal course, or ephemeral notions of public opinion about crime in general. Black's Law Dictionary defines *affect* as "[m]ost generally, to *produce an effect on*; to *influence in some way*." *Affect, Black's Law Dictionary* (11th ed. 2019) (emphasis added). And *Merriam-Webster's Collegiate Dictionary* defines *affect*, in part, as "to *produce a material influence* on or *alteration* in." *Affect, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) (emphasis added).

Here, there was no suggestion that Hart's offenses produced any *material influence on* or *alteration in* the routine activity of the Department of State. As Judge May wrote in her dissent in *Hubbard,* to recognize OSP jurisdiction in such circumstances would be "to expand the OSP's reach beyond its constitutional and statutory limits." *Hubbard,* 392 So. 3d at 1075.

> To follow the OSP's logic to its full extent, any act committed in a single judicial circuit that involves licensing in the Second Judicial Circuit would necessarily fall within the grasp of the OSP's overreaching arm. Crimes such as driving with a suspended driver's license, or violation of a state-issued license or state agency regulation would all transform a single judicial circuit offense into one that the OSP could prosecute. That cannot be supported by either the constitution or the enabling legislation. Nor should the OSP be able to cherry-pick when it can prosecute a single-circuit crime.

*Id.* In fact, by the *Hubbard* majority's reasoning, the OSP would be authorized to prosecute virtually any crime in the state because the public is concerned with crime rates. In short, notwithstanding the clear intention of the constitution and enabling statute to constrain its

11

authority within strict limits, the OSP's jurisdiction effectively would extend throughout Florida, unbound by any effective limitation.

For the foregoing reasons, we conclude that the Office of the Statewide Prosecutor lacked prosecuting authority over the offenses charged against Hart. We reverse Hart's conviction and sentence and remand with directions to dismiss the information. We certify that our decision conflicts with those of the Third and Fourth Districts in *State v. Hubbard*, 392 So. 3d 1067 (Fla. 4th DCA 2024), *reh'g denied* (Sept. 23, 2024), *review granted,* No. SC2024-1522, 2025 WL 79096 (Fla. Jan. 13, 2025); and *State v. Miller*, 394 So. 3d 164 (Fla. 3d DCA 2024), *reh'g denied* (Aug. 21, 2024).

Reversed and remanded with directions; conflict certified.


VILLANTI, Concurs.
ATKINSON, J., Concurs in result only with an opinion.

ATKINSON, Judge, Concurring in result only.

I agree with the majority that the judgment and sentence must be reversed because under the facts and procedural history of this case, the Office of Statewide Prosecutor (OSP) lacked jurisdiction under the State's charged theory that Mr. Hart committed crimes that occurred in more than one judicial circuit as part of a related transaction. As such, I concur in result only. I write separately to explain why I disagree with the majority's conclusion that OSP would lack "effects" jurisdiction under the amended statute. I also write separately to address one of the State's arguments and its similarity to an argument advanced by the Third District Court of Appeal concerning OSP's "occurrence" jurisdiction that I respectfully consider to be flawed.

**I.**

12

OSP has "occurrence" jurisdiction when an eligible offense "is occurring, or has occurred, in two or more judicial circuits as part of a related transaction." § 16.56(1)(a), Fla. Stat. (2020). In this case, the State theorizes that OSP has "occurrence" jurisdiction because Mr. Hart's false affirmation was part of a related transaction, the components of which took place in two circuits, thereby invoking OSP's jurisdiction. First, it occurred in the Thirteenth Circuit when Mr. Hart registered to vote. Then, it occurred in the Second Circuit when the Florida Department of State verified his registration.

To support its theory, the State argues that the " 'related transaction' need not be comprised exclusively of criminal activity." Citing *King v. State*, 790 So. 2d 477 (Fla. 5th DCA 2001), the State points to burglary as a crime under the ambit of OSP's jurisdiction but which can only logically occur in *one* location (that of the structure being burglarized), presumably within one circuit. From this, the State draws the conclusion that OSP's "occurrence" jurisdiction need not involve *crimes* that occur in more than one circuit so long as the transaction to which the single-circuit criminal activity is *related* involves another circuit. *See id.* at 479 ("Nothing is more 'local' than a burglary unless the property burgled happens to sit on both sides of a county line."). As the majority points out, *King* and cases like it do not support the State's jurisdictional argument.

The State relies upon the reasoning of *King* to construct the *reductio ad absurdum* argument that because "all the elements of a burglary will occur simultaneously in the same place" (not in two separate circuits), burglary could never be prosecuted by the OSP under Mr. Hart's restrictive theory of OSP jurisdiction even though burglary is explicitly enumerated as a prosecutable crime in the OSP statute. But it

13

is not a necessary implication of Mr. Hart's argument or the majority's reasoning that OSP can never prosecute a burglary because that crime cannot occur in more than one place. OSP *can* prosecute burglaries—even if the structure being burglarized is located completely within the bounds of one circuit and does not happen to straddle a circuit border. However, the burglary must be part of a related transaction that includes one or more *other crimes* that occur in at least one other circuit. In *King*, the Fifth District was contemplating "a series *of burglaries* occurring *in separate circuits* [that] were related." *See id.* (emphasis added). In this case, by contrast, the State is alleging a series of occurrences that include only *one* crime in *one* circuit, combining that crime with *noncriminal* actions (committed by third parties) in another circuit to arrive at what it passes off as "occurrence" jurisdiction based on a multi-circuit transaction related to one crime occurring in a single circuit. In doing so, the State conflates the "related transaction" that must occur across multiple circuits with individual crimes that can each occur within one of those circuits. But, contrary to the State's argument, single circuit crimes can form a basis for OSP jurisdiction only if *there are at least a total of two crimes that occur in different circuits*. Criminals could, for example, plan to burglarize a dwelling in one circuit but fence the stolen property in another circuit. *See* § 810.02(1)(b), Fla. Stat. (2020) (" '[B]urglary' means . . . [e]ntering a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter . . . ."); § 812.019(1) ("Any person who traffics in, or endeavors to traffic in, property that he or she knows or should know was stolen shall be guilty of a felony of the second degree . . . ."). In that scenario, there will be "violations of criminal laws" that take place in two

14

or more circuits, *see* art. IV, § 4(b), Fla. Const.—the burglary that occurs in one circuit and the fencing of the stolen property that occurs in another circuit. *Cf. King*, 790 So. 2d at 479 ("King had for some time . . . operated a motorcycle chop shop in Orange County (Ninth Circuit) which depended in part on stolen motorcycles from Volusia County (Seventh Circuit)."). Those criminal law violations would have occurred "as part of a related transaction," *see* art. IV, § 4(b), Fla. Const.—the pilfering of goods where they could be obtained with a plan to sell the ill-gotten items where there were available buyers.

The State's formulation, by contrast, is unsupported by the constitutional language conferring jurisdiction on OSP. Under the constitution, it is not only the related transaction that must involve more than one circuit but also the crimes themselves that must *occur* in "two or more judicial circuits." *Id.* The constitution uses the phrase "violations of criminal laws" when it describes what must occur in two or more circuits: "The statewide prosecutor shall have concurrent jurisdiction with the state attorneys to prosecute *violations of criminal laws* occurring or having occurred, in two or more judicial circuits as part of a related transaction . . . ." *See id.* (emphasis added). That language puts the lie to the theory that OSP can prosecute crimes occurring in only one circuit because they are part of a related *transaction* that involves noncriminal activity in other circuits. Under the State's theory, the aspects of the related transaction that allegedly occurred outside of the Thirteenth Circuit—for example, the Florida Department of State's receipt of voter registration information—are not "violations of criminal laws." But that is what the constitution requires to be "occurring" or to have "occurred" in more than one judicial circuit— "violations of criminal laws." *See id.*

15

Advancing an argument that I perceive to be similarly flawed, the Third District in *Miller* erroneously construed the noncriminal activity undertaken by third parties in another circuit as *part of* and *necessary to* the completion of the crime committed by the defendant in the circuit in which the crime was being prosecuted. *See State v. Miller*, 394 So. 3d 164, 168–69 (Fla. 3d DCA 2024) ("Miller would not have been able to register to vote, and ultimately vote, without his filling out the form in Miami-Dade County, the processing and approval of his voter registration in Leon County, and the conveyance of such approval back to Miami-Dade County. . . . [T]hese transactions that occurred in multiple jurisdictions were not only related, but they were also required acts before Miller got his voter registration and proceeded to vote."). In so doing, the Third District mischaracterized the crimes with which the defendant was prosecuted. The crimes were "making false affirmations in connection with an election and . . . voter fraud," *see id.* at 166 (citing §§ 104.011, .15, Fla. Stat. (2020))—not *becoming a registered voter* and not *having one's vote counted*. The crimes were committed when the defendant submitted false information on his application and when the defendant cast his ballot. As to both offenses, the acts that consummated the offense were committed solely in Miami-Dade County.

Indeed, by the Third District's logic, no person could ever commit a violation of section 104.011 if the Department of State does not verify the authenticity of the information on a voter registration. Under circumstances in which a voter registration application is never transmitted to Leon County in the Second Circuit, *cf., e.g.*, § 97.053(2), Fla. Stat. (2020) (requiring that voter registration applications be "complete" with "all information necessary to establish the applicant's eligibility" before verification by the Florida Department of State);

§ 97.073(1) (explaining that the supervisor of elections must notify the applicant if his or her application is incomplete and request the missing information), an individual who attempted to register fraudulently would not have committed a crime under the Third District's rationale. If, for example, a would-be perpetrator's prevarication is detected before his or her application is sent to the Department of State and he or she never becomes a registered voter, then—according to the reasoning of the Third District's *Miller* opinion—the individual has committed no crime even though he or she did "willfully submit[] . . . false voter registration information" or "swear[] or affirm[] falsely" on a voter registration application. § 104.011(1)–(2).

Fortunately, criminal liability under section 104.011 does not depend on a failure of efforts to interdict such fraudulent voter registration activity and stymie it before it affects the electoral process. A violation of the prohibitions on swearing falsely and submitting false voter registration information in section 104.011 does not require the consummation of the registration process; rather, the crime has been committed when the defendant swears falsely or submits the false information. *Cf.* § 97.053(1) ("Voter registration applications . . . must be accepted in the office of any supervisor, the division, a driver license office, a voter registration agency, or an armed forces recruitment office when hand delivered by the applicant or a third party during the hours that office is open or when mailed."); § 97.053(3) ("The registration date for a valid initial voter registration application that has been hand delivered is the date that the application is received . . . ."); § 97.053(4) ("The registration date for a valid initial voter registration application that has been mailed . . . is the date of that postmark.").

17

And a violation of the prohibition on the willful voting by unqualified electors under section 104.15 does not require the perpetrator's vote to be tallied and counted among those comprising the ultimate vote totals at the Department of State in the Second Circuit. Rather, the crime of unqualified voting has been committed once the perpetrator casts his or her ballot. Nothing in the Florida Election Code indicates that an individual's act of voting is inchoate until the county vote totals are sent from the local supervisor of elections to the Department of State. *Cf.* § 97.021(9) (" 'Early voting' means *casting a ballot* prior to election day at a location designated by the supervisor of elections and depositing the voted ballot in the tabulation system." (emphasis added)); § 97.021(25) (defining " 'Overvote' as when an "elector marks or designates more names than there are persons to be elected to an office or designates more than one answer to a ballot question" even though "the tabulator records no vote for the office or question."). Thus, the Third District was mistaken when it concluded that the crime "wouldn't have occurred" "but for" "the transmission to, and processing of, the voting form in Tallahassee, Leon County." *See Miller*, 394 So. 3d at 169 n.4 ("[W]hile Miller himself acted only in one jurisdiction, the chain of events that led to the consummation of the crime necessarily occurred in two or more jurisdictions."). Again, the crimes are not *making it onto the voter rolls* or *affecting the vote total*. The crimes are swearing falsely, submitting false voter registration information, and voting. Contrary to the Third District's rationale, voting is "consummat[ed]," *see id.*, when the ballot is cast, and the registration crimes are consummated when the oath is sworn or the information is submitted, long before any election returns or voter registration data might make their way to the Division of Elections in the Second Circuit. *Cf.* § 97.021(44) (" 'Voter registration

18

official' means any supervisor of elections or individual authorized by the Secretary of State to accept voter registration applications and execute updates to the statewide voter registration system."); § 101.041, Fla. Stat. (2020) ("In all elections[,] . . . the voting shall be by secret, official ballot as provided by this code . . . .").  Thus, the "related transactions" undertaken in the Second Circuit when the Department of State receives voter registration information or vote totals from the Supervisors of Elections are not at all "necessary" for the commission of the crimes being prosecuted.  And the Third District's reliance on those noncriminal activities as transactions relating to single-circuit law violations for purposes of OSP's "occurrence" jurisdiction is contrary to the language of the constitutional jurisdiction clause and related statutes, as well as that of the criminal statutes under which Messrs. Miller and Hart were prosecuted.

## II.

While I agree with the result reached by the majority, I disagree with its conclusion that OSP would lack "effects" jurisdiction under the amended statute if it applied Mr. Hart's case.  Like the majority, I am skeptical that nebulous notions of effects on public opinion are within the ordinary meaning of the term "affect."  *See State v. Hubbard*, 392 So. 3d 1067, 1073 (Fla. 4th DCA 2024) (concluding OSP had jurisdiction because "voter fraud impacts the public's confidence in elections throughout the state").  However, it cannot be said that election fraud occurring in Hillsborough County in the Thirteenth Circuit has *no* effect on what happens at the Department of State in Leon County in the Second Circuit—the latter being the location where the voting results are received for verification and the ultimate pronouncement of the official results of an election.

19

The majority points out that "the votes in *Hillsborough* County were tabulated *locally*" and that "[o]nly the resulting totals for federal or state offices were conveyed to the division" in the Second Circuit. *See* Maj. Op. at 6 n.3. Omitted from that discussion is what happens with those vote totals in the Second Circuit—they are received by the Department of State and then added together with the vote totals from all the other counties to determine who won the elections for those federal and state offices. *See* § 102.112(1), Fla. Stat. (2020) ("The county canvassing board or a majority thereof shall file the county returns for the election of a federal or state officer with the Department of State immediately after certification of the election results."); § 102.111(2) ("The Elections Canvassing Commission shall meet . . . to certify the returns of the election for each federal, state, and multicounty office."); § 102.121 ("The Elections Canvassing Commission shall make and sign separate certificates of the result of the election for federal and state officers, which certificates shall be written and contain the total number of votes cast for each person for each office."). The sum of those vote totals would be different if Mr. Hart had not cast a vote in Hillsborough County; it would be reduced by one. Thus, Mr. Hart's crime, committed in Hillsborough County in the Thirteenth Circuit, undoubtedly *affects* another circuit—the Second Circuit, where the Department of State and the Elections Canvassing Commission will arrive at a *different* vote total as a consequence of the illegal vote cast by Mr. Hart, increasing the Hillsborough County vote total by one and increasing the statewide total by one. Regardless of whether that one fraudulent vote swung the result of the election from any one candidate in favor of another, it cannot be gainsaid that the *total* amount of votes received by any candidate for whom Mr. Hart voted was altered by Mr. Hart having cast an illegal vote.

20

This *effect* on the statewide total of the votes that were ultimately tallied in Leon County for the federal and statewide races is mathematically undeniable.

The ramifications of Mr. Hart's acts committed in Hillsborough County thereby "affects" Leon County in a manner consistent with the dictionary definitions of the term relied upon by the majority. It is logical and intuitive that voter fraud "influence[s]" what happens in the Second Circuit—the addition of a fraudulent vote "*produce[s] a material influence*" on the result of the process of tallying the county vote totals cast throughout the State and the pronouncing of election winners; it causes an "*alteration*" in the number of votes computed in favor of a candidate or ballot initiative.

Likewise, the submission of false voter registration information or false swearing or affirming on a voter application could affect the Second Circuit, within which the Department of State maintains voter rolls. *See* § 97.021(17) (" 'Lists of registered electors' means names and associated information of registered electors *maintained by the department* in the statewide voter registration system or generated or derived from the statewide voter registration system." (emphasis added)); § 98.035(1)–(2), Fla. Stat. ("The Secretary of State, as chief election officer of the state, shall be responsible for implementing, operating, and maintaining, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive, computerized statewide voter registration system . . . [which] must contain the name and registration information of every legally registered voter in the state. . . . The system shall be the official list of registered voters in the state . . . ."). Statutorily, the Department of State has involvement with every voter registration application, playing an integral role in verifying the information that a voter registration

21

applicant submits. *See* § 97.053(6) ("A voter registration application may be accepted as valid only after *the department* has verified the authenticity or nonexistence of the driver license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant." (emphasis added)); § 97.053(2) ("A voter registration application is complete and becomes the official voter registration record of that applicant when all information necessary to establish the applicant's eligibility pursuant to s. 97.041 is received by a voter registration official *and verified pursuant to subsection (6)*." (emphasis added)). Fraudulent voter registration information submitted in violation of section 104.011 that encounters the security net of the verification process at the Department of State in Leon County—and, if the application slips through that net, leads to an additional voter on the rolls who should not be there—undoubtedly "affects" the Second Circuit. Further affecting operations of the Department in the Second Circuit, any such fraudulent voter application registrant who initially slipped through might become the subject of the Department's duty to remove the individual if his ineligibility is later detected. *See* § 98.075(1), (5) (mandating that "[t]he department shall protect the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records" and providing for procedures by which the department should identify and facilitate the removal of ineligible registered voters, such as, for example, "those registered voters who have been convicted of a felony and whose voting rights have not been restored").

For these reasons, I contend that the violations of law committed by Mr. Hart would have afforded OSP prosecutorial jurisdiction under the

amended statute's "affects" provision if it applied in this case.[5]  Being that it does not apply, I concur in result only with the majority's conclusion that OSP lacked jurisdiction under the "occurring" provision upon which the State based the allegations of the information that led to Mr. Hart's conviction.

_____

Opinion subject to revision prior to official publication.

_____

[5] I agree with the Fourth District insofar as its retroactivity analysis indicates that application to *conduct* that predated the statutory amendment (such as Mr. Hart's criminal conduct) would not constitute an impermissible retroactive application of the amended statute.  *See State v. Hubbard*, 392 So. 3d 1067, 1072 (Fla. 4th DCA 2024) ("The 2023 amendments to section 16.56 do not expand or diminish Hubbard's rights.  The amendments merely address whether the local prosecutor or the OSP has the authority to prosecute certain cases. . . .  Thus, the amendments do not impact elements of the offense or the punishment if convicted, but only which arm of the state conducts the prosecution[,] . . . [and they] do not apply 'new legal consequences to events completed before its enactment.' " (quoting *Love v. State*, 286 So. 3d 177, 187 (Fla. 2019))).  However, "whether a new procedural statute applies in a pending case will generally turn on the posture of the case, not the date of the events giving rise to the case," and such applicability would not be "in and of itself a retrospective operation of the statute."  *See Love*, 286 So. 3d at 187–88 ("Of course, the mere fact that a new rule is procedural does not mean that it applies to every pending case.  A new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed under the old regime . . . ." (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 n.29 (1994))).  In *Hubbard*, the appellate court reversed an order dismissing the information filed by the State.  *Hubbard*, 392 So. 3d at 1069 ("[W]e reverse the circuit court's dismissal and remand for further proceedings.").  In this case, Mr. Hart has already been charged, tried, and found guilty—a case posture that is not conducive to a "commonsense" application of a newly amended procedural provision.  *Cf. Love*, 286 So. 3d at 187–88 (concluding that an amended procedural provision applied only "to those immunity hearings, including in pending cases, that take place on or after the statute's effective date").